# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **CARRODY M. BUCHHORN, TIMOTHY D.** | ) | |
| **BUCHHORN, GREGORY W. SNELL, AND** | ) | |
| **MATTHEW T. BUCHHORN,** | ) | |
| | ) | |
| **PLAINTIFFS,** | ) | |
| | ) | |
| **V.** | ) | **CASE NO.:** |
| | ) | |
| *MUNICIPALITY DEFENDANTS:* | ) | |
| **THE BOARD OF COUNTY** | ) | |
| **COMMISSIONERS OF THE COUNTY** | ) | |
| **OF DOUGLAS COUNTY, KANSAS;** | ) | |
| **CITY OF EUDORA, KANSAS;** | ) | |
| | ) | |
| *CORONER DEFENDANT:* | ) | |
| **ERIK MITCHELL, M.D., IN HIS** | ) | |
| **INDIVIDUAL CAPACITY,** | ) | |
| | ) | |
| *PROSECUTOR DEFENDANTS:* | ) | |
| **SUZANNE VALDEZ; AND** | ) | |
| **JOSHUA SEIDEN, BOTH IN THEIR** | ) | |
| **INDIVIDUAL CAPACITIES,** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

## COMPLAINT AND JURY DEMAND

The Plaintiffs Carrody M. Buchhorn, Timothy D. Buchhorn, Gregory W. Snell, and

Matthew T. Buchhorn, by and through their attorneys, allege:

## TABLE OF CONTENTS

Table of Contents ........................................................................................................... i

Introduction ................................................................................................................... 1

Jurisdiction and Venue .................................................................................................. 4

Parties ........................................................................................................................... 4

    Plaintiffs .................................................................................................................. 4

    Municipality Defendants ......................................................................................... 5

    Coroner Defendant .................................................................................................. 6

    Prosecutor Defendants ............................................................................................ 7

Facts ............................................................................................................................. 7

    Douglas County hires Mitchell despite his well-documented history of unethical, unprofessional, and illegal activities as a coroner ............................................. 7

    O.O. dies of natural causes ................................................................................... 11

        The operation of a normal heart ...................................................................... 12

        The operation of a neural heart in the womb—fetal circulation .......................... 13

        The operation of an abnormal heart with a patent foramen ovale ..................... 14

        O.O.'s heart possessed a patent foramen ovale and ischemic damage ............... 15

    Mitchell manufactures false evidence to frame Mrs. Buchhorn ....................................... 16

    Defendants suppress evidence of Mrs. Buchhorn's innocence, in violation of *Brady* ..... 19

    Based on Mitchell's manufactured and suppressed evidence, Mrs. Buchhorn was charged, bound over, tried, convicted, and sentenced for murdering O.O. and sent to prison ........ 20

    Post-conviction, Mrs. Buchhorn's new counsel exposes that Mitchell's cause of death theory was junk science ............................................................................ 22

        Dr. Kessler opines O.O. did not die from head trauma and Mitchell's "magical disruption of the brain" theory was "fantastical," resulting in "laughter" from colleagues ............................................................... 22

        Dr. Ng opines Mitchell's theory of death was "just not possible without any evidence that there was some brain injury," concluding O.O. did not die from head trauma ............................................................ 24

        Ms. Craig, Esquire opines a neurologist was required to opine on Mitchell's cause of death theory ...................................................... 25

        Dr. Wigren also opines a neurologist was required .............................................. 26

Mitchell admits he committed perjury .................................................................... 26

Dr. Hutchinson opines Mrs. Buchhorn lacks the psychological ability to murder a baby ........................................................................................ 26

Mrs. Buchhorn's Conviction is Reversed and Remanded on Ineffective Assistance of Counsel Pursuant to *Strickland* ...................................... 27

The district court, acknowledging that Defendants' abandonment of Mitchell eliminated the basis for the previous probable cause finding, orders a new preliminary hearing ................................................................ 28

With active, ongoing oversight by the Court of Appeals via a *habeas* petition, the district court dismisses criminal charges after Defendants were unable to meet the probable cause burden .................................... 29

Demonstrating confidence that their conspiracy would work and Mrs. Buchhorn would spend years in prison, Defendants steal Mrs. Buchhorn's laptop computer .................... 33

Dr. Jane Turner exposes the conspiracy, revealing O.O. died of natural causes ............. 37

With no criminal charges pending, Valdez and Seiden issue a statement falsely accusing Mrs. Buchhorn of murdering O.O. ........................................................................ 41

Without Any Criminal Charges Pending, Valdez and Seiden Make a Public Presentation in which They Falsely Claim Mrs. Buchhorn Murdered O.O. ........................................................................ 43

The Municipality Defendants Caused Plaintiffs' Injuries ................................................. 45

Informal policies, procedures, and customs created widespread abuse of government authority ...................................................................... 46

Failure to adequately train and supervise its employees permitting the misconduct ........................................................................................ 47

Municipality Defendants ratified the conduct and fostered the culture ............... 48

Valdez openly admitted to the known existence of this culture of unconstitutional misconduct ............................................................ 49

Aware of her innocence, Mrs. Buchhorn is subjected to cruel and unusual punishment in Douglas County's jail while being forced to babysit a suicidal prisoner to save the County the trouble and cost of suicide watch ......... 49

Damages .......................................................................................................................... 51

Defendants Interfered with Plaintiffs' Care, Custody, and Control of their Children, A Fundamental Liberty Interest Protected by the United States Constitution and the Kansas Constitution ....................................................................................................................... 52

Claims for Relief ............................................................................................................. 53

COUNT 1 Fabricating and Perpetuating a Knowingly False and Nonexistent Cause of Death in Violation of 42 U.S.C. § 1983 ........................... 53

COUNT 2 Conspiracy to Deprive Constitutional Rights by Fabricating and Perpetuating a Knowingly False and Nonexistent Cause of Death in Violation of 42 U.S.C. § 1983 ................................................................ 55

COUNT 3 *Brady* Violations and Fabricating Evidence in Violation of 42 U.S.C. § 1983 ................................................................................................ 56

COUNT 4 Malicious Prosecution and Unlawful Pretrial Detention in Violation of 42 U.S.C. § 1983 .......................................................................... 58

COUNT 5 Conspiracy to Deprive Constitutional Rights in Violation of 42 U.S.C. § 1983 ........................................................................................... 60

COUNT 6 Municipal Liability for Violations of 42 U.S.C. § 1983 ................... 61

COUNT 7 Interference with Family Relationships in Violation of 42 U.S.C. § 1983 .............................................................................................. 64

COUNT 8 Seizure, Destruction, and Taking of Property Without Just Compensation in Violation of 42 U.S.C. § 1983 ................................................. 65

Demand for Jury Trial .......................................................................................... 67

Designation of Place of Trial ................................................................................ 67

Prayer for Relief .................................................................................................... 67

## INTRODUCTION

1.      On July 26, 2018, Plaintiff Carrody M. Buchhorn was wrongfully convicted in the death of a nine-month-old baby named O.O.

2.      After he died but before his autopsy, O.O.'s heart was removed and donated, where his heart valves were harvested. In conjunction, a heart autopsy was performed by a pathologist specializing in cardiac tissue. A report was generated with microscopic slides. That report and slides revealed that O.O. suffered from a congenital heart defect—a patent foramen ovale, or a hole in his heart that allowed blood to flow through the heart without being filtered of debris in the lungs. The cardiac autopsy also found a "focal area of acute ischemia"—a portion of the heart that had been damaged by deprivation of oxygen between 12- and 24-hours prior to the child's death.

3.      Despite having the heart autopsy report—dated just 7 days after the child died—Defendants worked together to falsely accuse and frame Mrs. Buchhorn for a murder that never occurred. For eight years since have continued working together concealing their falsehoods while continuing to publicly to accuse Mrs. Buchhorn of murdering a 9-month-old-child they well know died of natural causes.

4.      As the centerpiece of their scheme, Defendants fabricated a fictional cause of death they designed to implicate Mrs. Buchhorn, and only Mrs. Buchhorn. To do this Defendants first had to manufacture evidence to lead inquiry away from the true cause of death. They began by altering the autopsy record to falsely document that the child's heart was normal. But the normal heart described in Mitchell's autopsy report had to be fabricated as on September 30 he could not have examined a heart that had been removed the day before, September 29, for tissue donation. But the absence of a heart did not deter Mitchell from documenting examination of a non-existent heart in his September 30 autopsy, finding it normal and describing it as having formed a fossa

1

ovalis—*meaning the hole between the chambers of the fetal heart had closed and there was no patent foramen ovale*.

5.    As we now know from discovery of Dr. Mackey-Bojack's suppressed October 6, 2016 report, and Dr. Turner's January 3, 2023 report, these statements are simply false. No fossa ovalis had ever formed in the child's heart, and as Dr. Mackey-Bojack's report, sent contemporaneously to Mitchell, states the child's heart had a potentially deadly congenital defect, a patent foramen ovale, which ultimately caused the child's death, as evidenced, inter alia, by the also suppressed findings by Dr. Mackey-Bojack of ischemic damage to the child's heart.

6.    Having hidden the true cause of death, it was necessary to create a cause that could be blamed on Mrs. Buchhorn. In furtherance of their scheme, Mitchell crafted a fictional cause of death theory by which O.O. died from head trauma. But because death from head trauma always leaves brain injury and the child had no brain injury, Mitchell made up a scientific sounding theory—*depolarization of neurons*—in which a blow to the head, not powerful enough to injure the brain, was sufficiently powerful to interfere with the brain's ability to control breathing, causing the child to stop breathing and to immediately or nearly immediately suffocate.

7.    But *depolarization of neurons* has now been revealed as junk science, an unreliable theory without any factual basis or support in the scientific/medical community. Likewise, Mitchell has now admitted that his testimony that there is statistical support for the theory was a lie and the name he gave the theory itself—*depolarization of neurons*—is something he simply made-up.

8.    This claim that the death was immediate was critical to the scheme to falsely frame Mrs. Buchhorn as a murderer because there was no other way to link Mrs. Buchhorn to the child's death. Mrs. Buchhorn happened to be the only adult present when the child died, and Defendants

needed a theory that could be used to blame her on that basis alone. Thus, Defendants conjured an explanation of death that would point to Mrs. Buchhorn and only Mrs. Buchhorn.

9.      For their scheme to work, Defendants had to conceal and suppress evidence that would have proven Mrs. Buchhorn's innocence: Dr. Mackey-Bojack's cardiac autopsy, which showed that O.O. died of natural causes. Defendants likewise suppressed evidence of Mitchell's history of manufacturing evidence to convict innocent people.

10.      Due to Defendants' foul play, Mrs. Buchhorn was convicted in O.O.'s death at an unfair trial. Before she was sentenced, Mrs. Buchhorn obtained new counsel, who exposed the nonexistent cause of death and sought a new trial. The district court, deceived by Defendants' repeated lies, denied Mrs. Buchhorn's relief, and she sent to prison.

11.      Though Mrs. Buchhorn successfully overturned the conviction, Defendants remained undeterred and continued to fight to prevent Mrs. Buchhorn's release, searching for an expert witness to replace Mitchell but who would reach the same conclusion.

12.      Finally, on December 16, 2022—because Defendants failed to meet their minimal probable cause burden—the criminal charges against Mrs. Buchhorn were finally dismissed, and she regained her freedom.

13.      Weeks later, Defendants received a report from Dr. Jane Turner, who disclosed for the first time that Mitchell had concealed and lied about both his own autopsy report and Dr. Mackey-Bojack's report. Based upon the patent foramen ovale and ischemic damage found by Dr. Mackey-Bojack, Dr. Turner concluded that the child's death had been due to natural causes.

14.      But though Dr. Turner's discovery of the cardiac autopsy and explanation that no murder occurred (and that Mrs. Buchhorn is certainly innocent) caused Defendants to announce they would drop the prosecution, Defendants remained recalcitrant, publishing a statement to the

press in which they allege that despite Dr. Turner's conclusion that the death had been due to natural causes, they were in possession of other evidence that Mrs. Buchhorn was guilty of murder.

15.    And a month later in a presentation made in a public forum, they stated they were in possession of "secret evidence" that they could not "legally reveal," that supported a belief that Mrs. Buchhorn had murdered O.O.

16.    When Mrs. Buchhorn sought a certificate of exoneration under K.S.A. 60-5004, Defendants denied the claim, saying they had reopened their investigation into Mrs. Buchhorn for murder and had come into possession of "new evidence" proving her guilt.

17.    But these statements were also false, as there was no new or reopened investigation, and there has never been any new evidence found supporting a belief that Mrs. Buchhorn ever harmed the child in any way.

18.    Plaintiffs now bring this action to obtain justice and redress the devastating injuries Defendants caused Mrs. Buchhorn and her family.

## JURISDICTION AND VENUE

19.    This action is brought under 42 U.S.C. § 1983 to redress Defendants' deprivation under color of law for Plaintiffs' rights, as secured by the United States Constitution.

20.    This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331.

21.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and 28 U.S.C. § 1391(b)(3) because the majority of defendants are subject to this Court's personal jurisdiction in this district.

## PARTIES

### Plaintiffs

22.    Plaintiff Carrody M. Buchhorn is an individual citizen of the State of Kansas.

23.     Plaintiff Timothy D. Buchhorn is an individual citizen of the State of Kansas.

24.     Plaintiff Gregory W. Snell is an individual citizen of the State of Kansas.

25.     Plaintiff Matthew T. Buchhorn is an individual citizen of the State of Kansas.

**Municipality Defendants**

26.     Defendant The Board of County Commissioners of The County of Douglas County, Kansas ("Douglas County"), is a Kansas municipality located in Douglas County, Kansas. It is authorized to sue or be sued in its own name. Its headquarters is located at 1100 Massachusetts Street, Lawrence, Kansas 66044.

27.     The Douglas County Kansas Sheriff's Office ("Sheriff's Office") is an agency and department of Douglas County.

28.     At all times relevant to this Complaint, the edicts or acts of employees and agents of the Sheriff's Office may fairly be said to present the official policy of the Sheriff's Office and therefore Douglas County.

29.     The District Attorney's Office ("DA's Office") is an agency and department of Douglas County.

30.     At all times relevant to this Complaint, the edicts or acts of employees and agents of the DA's Office may fairly be said to present the official policy of the DA's Office and therefore Douglas County.

31.     The Douglas County Coroner's Office ("Coroner's Office") was an agency and department of Douglas County.

32.     At all times relevant to this Complaint, the edicts or acts of employees and agents of the Coroner's Office may fairly be said to present the official policy of the Coroner's Office and therefore Douglas County.

33.     Defendant City of Eudora, Kansas ("Eudora"), is a Kansas municipality located in Douglas County, Kansas. It is authorized to sue or be sued in its own name. Its headquarters is located at 4 E Seventh Street, Eudora, Kansas 66025.

34.     The Eudora Police Department ("Eudora PD") is an agency and department of Eudora.

35.     At all times relevant to this Complaint, the edicts or acts of employees and agents of the Eudora PD may fairly be said to present the official policy of the Eudora PD and therefore Eudora.

36.     Within this Complaint, Douglas County (and its Sheriff's Office, DA's Office, and Coroner's Office) and Eudora (and its Eudora PD) are collectively referred to as the "Municipality Defendants."

**Coroner Defendant**

37.     Defendant Erik Mitchell, M.D. was, at all times relevant to this Complaint, the duly appointed and active District Coroner of Douglas County, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Douglas County. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

38.     At all times relevant to this Complaint, Mitchell was the immediate supervisor of the Coroner's Office, who in turn was supervised by the County Commission of Douglas County.

39.     The edicts or acts of Mitchell may fairly be said to present the official policy of the District Coroner, the Coroner's Office, and therefore Douglas County.

## Prosecutor Defendants

40.     Suzanne Valdez was, at times relevant to this Complaint, the District Attorney of Douglas County, Kansas, acting within the scope of her employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Douglas County as well as the State of Kansas. Upon information and belief, she is entitled to indemnification under statute and by contract. She is sued in her individual capacity.

41.     At all times relevant to this Complaint, Valdez was the supervisor of the DA's Office, who in turn was supervised by the County Commission of Douglas County.

42.     Joshua Seiden was, at times relevant to this Complaint, an Assistant District Attorney of Douglas County, Kansas, acting within the scope of his employment and under color of law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Douglas County as well as the State of Kansas. Upon information and belief, he is entitled to indemnification under statute and by contract. He is sued in his individual capacity.

43.     At all times relevant to this Complaint, Seiden was a supervisor of the DA's Office, who in turn was supervised by Valdez, who in turn was supervised by the County Commission of Douglas County.

44.     Within this Complaint, Defendants Valdez and Seiden are collectively referred to as the "Prosecutor Defendants."

## FACTS

## Douglas County hires Mitchell despite his well-documented history of unethical, unprofessional, and illegal activities as a coroner

45.     Mitchell possesses a well-documented and well-publicized history of unethical, unprofessional, and illegal activities as a coroner.

7

46.     For example, in a November 20, 1993 article by *The New York Times*, entitled "Syracuse Medical Examiner Agrees to Quit After Inquiry," it was reported:

> "The Onondaga County Medical Examiner, Dr. Erik Mitchell, agreed to resign today after a prosecutor's investigation concluded that he had overstepped his authority and mismanaged his office.
>
> Among other things, prosecutors found that Dr. Mitchell routinely removed organs from corpses without the consent of the victims' families and improperly stored skeletons and body parts in his office.
>
> Dr. Mitchell, 42, resigned as chief Medical Examiner effective immediately and will leave the Medical Examiner's office effective Jan. 15, 1994, said his lawyer, Sidney Cominsky. County Executive Nicholas Pirro said he was ready to dismiss Dr. Mitchell if he did not resign.
>
> …
>
> Dr. Mitchell has been the county Medical Examiner for 10 years. Over the last year, he has come under intense criticism because of accusations by current and former employees that he engaged in unethical, unprofessional and illegal activities.
>
> District Attorney William Fitzpatrick announced today that a four-month investigation by his office corroborated many of the allegations.
>
> But rather than pursue criminal charges against Dr. Mitchell, Mr. Fitzpatrick said he recommended to Mr. Pirro that Dr. Mitchell resign. In return, Mr. Fitzpatrick agreed to close his investigation.
>
> …
>
> Dr. Mitchell remains under investigation by the state Department of Environmental Conservation, the Health Department and the Office of Professional Medical Conduct.
>
> The District Attorney began investigating Dr. Mitchell when it was revealed that a man convicted of child pornography had photographs taken of himself with a corpse in the Medical Examiner's office.
>
> The District Attorney also found that morgue employees took photographs of one another in playful poses over the body of a female suicide victim and that they

provided the pathology department at University Hospital in Syracuse with bladders and kidneys from about 150 bodies, often without family consent."[1]

47.     Similarly, in an August 27, 1994 article also by *The New York Times*, entitled "State says Medical School Got Body Parts Illegally," it was reported:

> "From 1985 to 1989, the Health Science Center was accepting body parts for scientific research from the former Onondaga County Medical Examiner, Erik Mitchell, a Health Department lawyer, Gary Eichenbaum, said today.
>
> The state found that Dr. Mitchell had donated prostates, bladders and testicles from about 150 bodies, many of them children, without the permission of families.
>
> …
>
> Dr. Mitchell was forced to resign last year to avoid criminal charges in the wake of mounting allegations that he had taken body parts for research without the consent of families and committed other illegal and unethical acts while running the county morgue. The accusations were raised by morgue employees.
>
> At least six families have filed civil lawsuits or notices of claim against Dr. Mitchell and Onondaga County over his conduct during 11 years in office.
>
> The State Health Department was also prepared to charge the county with body stealing for Dr. Mitchell's practices in the morgue, but the county agreed to impose more stringent controls over the office and the state agreed to suspend the $250,000 fine.
>
> Earlier this year, the State Department of Environmental Conservation fined the county $10,000 because Dr. Mitchell and his staff illegally stored mercury in the county lab and flushed diced brains and other organs down the morgue drain."[2]

48.     And in a May 10, 1999 article by *The New York Times*, entitled "Onondaga County Settles Organ Donation Lawsuit," it was reported:

> "Onondaga County has agreed to settle four lawsuits that claim a former medical examiner mishandled body parts and donated organs to science without permission.

---

[1] *Available at* https://www.nytimes.com/1993/11/20/nyregion/syracuse-medical-examiner-agrees-to-quit-after-inquiry.html.

[2] *Available at* https://www.nytimes.com/1994/08/27/nyregion/state-says-medical-school-got-body-parts-illegally.html.

The county will pay a total of nearly half a million dollars to four families under a settlement reached last week.

One lawsuit said that after Christine Sgambati, 4, was killed in a car accident in 1988, her parents, Alix and Daniel Sgambati, declined to donate her organs to science.

But years later, a State Health Department investigator revealed that the former medical examiner, Dr. Erik Mitchell, had removed Christine's reproductive organs and sent them to the State University of New York Health Science Center.

Another lawsuit claimed that after a 19-month old, Earl Joyner, died after choking on an apple in 1993, Dr. Mitchell removed and donated his brain without his mother's consent.

Dr. Mitchell, who resigned in November 1993 after prosecutors agreed not to present evidence to a grand jury, has said that he committed no wrongdoing."[3]

49.     These newspaper reports (and others) are readily available.

50.     To flee prosecution for criminal conduct in New York, Mitchell moved to Kansas.

51.     Despite these well-publicized reports (and others), Douglas County, over a span of 25 years, hired and repeatedly rehired Mitchell to serve as its District Coroner pursuant to K.S.A. 22a-226 from June 25, 1996 through November 1, 2021.

52.     Douglas County fixed and paid Mitchell's annual salary.

53.     Douglas County repeatedly reaffirmed its hiring and retention of Mitchell as its District Coroner, including on: (i) June 24, 1996 via Resolution No. 96-24; (ii) April 2, 2021 via Resolution No. 01-16; (iii) March 3, 2003 via Resolution No. 03-08; (iv) January 8, 2007 via Resolution No. 07-05; (v) July 6, 2011 via Resolution No. 11-22; (vi) October 30, 2013 via Resolution No. 13-31; and (vii) November 1, 2017 via Resolution No. 17-36.

---

[3]  *Available at*  https://www.nytimes.com/1999/05/10/nyregion/metro-news-briefs-new-york-onondaga-county-settles-organ-donation-lawsuit.html.

54.     Since 2017 and despite the reports of misconduct above—and elsewhere—Mitchell provided monthly training to Douglas County for employees to perform crime scene investigations for the coroner's office that Douglas County placed Mitchell in charge of.

55.     Effective April 30, 2018, Mitchell resigned as Douglas County's District Coroner.

56.     At the time of his resignation, Mitchell was also the coroner for:

      a.      Allen County;

      b.      Atchison County;

      c.      Chase County;

      d.      Leavenworth County;

      e.      Lyon County;

      f.      Neosho County;

      g.      Wilson County; and

      h.      Woodson County.

57.     When he resigned as District Coroner, Douglas County replaced Mitchell with his business partner, Dr. Hossain.

**O.O. dies of natural causes**

58.     Mrs. Buchhorn, a married mother of two, was employed at an in-home child daycare in Eudora, Kansas.

59.     On September 29, 2016, Mrs. Buchhorn found O.O. unresponsive following an afternoon nap.

60.     Mrs. Buchhorn attempted CPR while 911 was called and until paramedics arrived.

61.     Despite Mrs. Buchhorn's and the paramedics' efforts at resuscitation, O.O. died.

62.     O.O. was nine months old at the time of his death.

**The operation of a normal heart**

63.    A heart has four chambers, with two collection chambers (right and left atrium) and two pumping chambers (right and left ventricle):



64.    The process has four main steps: (1) the right atrium collects blood coming back to the heart after its trip around the body; (2) the right ventricle pumps the blood to the lungs; (3) the left atrium collects blood coming back from the lungs; and (4) the left ventricle pumps blood back out to the body:

12



65.     While passing through the lungs, blood is not just oxygenated; lungs also serve as a critical filter of clots (emboli) and debris generated within (endogenous) and outside (exogenous) the body.

### The operation of a neural heart in the womb—fetal circulation

66.     But a heart works differently in the womb, where the lungs are deflated, do not operate, and oxygen is supplied via the placenta and umbilical cord.

67.     To allow oxygen-rich blood to immediately circulate to the most important parts of the body, the heart creates a lung bypass system—a flap opening or hole (foramen ovale).

68.     The foramen ovale allows blood to flow from the collection chamber where it enters the heart via the umbilical cord (right atrium) to the collection chamber before being pumped out to the body (left atrium):



69.    When a baby is born and begins to breathe on its own, the bypass system is no longer needed.

70.    Pressure caused by blood pumping through the heart usually forces the flap opening of the foramen ovale to close automatically and the skin connects over the days and weeks following birth. This creates the fossa ovalis—a depression in the heart's right atrium, a remnant of the foramen ovale.

71.    Every human baby develops with the foramen ovale, and most form a fossa ovalis after the foramen ovale closes.

**The operation of an abnormal heart with a patent foramen ovale**

72.    When this hole between the chambers fails to close, no fossa ovalis is formed and the resulting defect in the structure of the heart is called a patent foramen ovale:



73.     A patent foramen ovale that exists beyond a newborn age is considered a congenital heart defect.

74.     This heart defect allows unoxygenated blood to shunt from the right atrium to the left atrium (avoiding filtering through the lungs), drop into the left ventricle, and be pumped out to the body.

75.     Thus, emboli (clots, air, fat, amniotic fluid, debris, etc.) can jump across the heart without being filtered out in the lungs, sending these clots through the body. This is called "paradoxical embolization."

**O.O.'s heart possessed a patent foramen ovale and ischemic damage**

76.     Following the child's death, his heart was removed under sterile conditions for the purpose of heart valve (tissue) donation. Mitchell participated in this removal in order to avoid "missed findings" and "problems with interpretation of findings," because the process "create[s] things that look like bruises."

15

77.     Later, when Mitchell performed his autopsy, there was no heart for Mitchell to examine. It was impossible for Mitchell to observe whether a fossa ovalis had formed.

78.     The heart was then examined by Dr. Shannon M. Mackey-Bojack, the Medical Director of the Jesse E. Edwards Registry of Cardiovascular Disease.

79.     Dr. Mackey-Bojack is a forensic and cardiovascular pathologist, is Board Certified in Pathology, and serves as the Medical Director of the Jesse E. Edwards Registry of Cardiovascular Disease located in United Hospital in St. Paul, Minnesota. Dr. Mackey-Bojack "specializes in examining cardiac tissue."

80.     Dr. Mackey-Bojack's cardiac examination describes O.O.'s heart as having a patent foramen ovale.

81.     At his age, the fetal hole in O.O.'s heart should already have closed.

82.     Based on his age, the fetal hole should already have closed; because he possessed a patent foramen ovale, O.O. possessed a congenital heart defect.

83.     Dr. Mackey-Bojack's cardiac autopsy also discovered that the left ventricle wall was deprived of oxygen (acute ischemia, or a myocardial infarction).

84.     Because this damage lacked changes to the cells, this pathophysiologic process took place 12-24 hours **before his death**.

85.     Mitchell possessed Dr. Mackey-Bojack's report and microscopic tissue slides before he issued his autopsy report.

### Mitchell manufactures false evidence to frame Mrs. Buchhorn

86.     Eudora's detectives recorded Mitchell's autopsy.

87.     Initially during the autopsy, Mitchell repeatedly states that he is unable to explain or identify O.O.'s cause of death.

16

88.     Later during the autopsy and without identifying a cause of death; prior to completing the autopsy; before receiving Dr. Mackey-Bojack's cardiac report or microscopic tissue slides; and without laboratory test results, Mitchell falsely suggests or speculates that:

      a.      O.O. was stepped on;

      b.      Mrs. Buchhorn has "brought suspicion";

      c.      O.O. was harmed immediately before he died;

      d.      The lack of brain swelling or injury to the brain means O.O. was injured immediately before he died, and it would have been obvious to a caregiver who failed to provide adequate care quickly enough to save O.O.;

      e.      There was a "very strong possibility" Mrs. Buchhorn dropped O.O.;

      f.      "Obviously somebody is at fault" for O.O.'s death;

      g.      "Statistically, it's more likely" that someone intentionally killed O.O.;

      h.      "Something happened the day he died. It was bad. Someone should have provided care earlier than they did."

89.     At the time of these statements, Mitchell knew that Mrs. Buchhorn was the only adult with O.O. when he died, and that his comments directly and solely implicated Mrs. Buchhorn in the murder of O.O.

90.     Before issuing the Report of Death on June 13, 2017, Mitchell had received and had access to Dr. Mackey-Bojack's cardiac autopsy report, showing both congenital heart defect and ischemic damage.

91.     Mitchell's Report of Death was issued by and on behalf of Douglas County and Municipality Defendants.

92.    When Mitchell issued his Report of Death, he failed to recognize or incorporate Dr. Mackey-Bojack's findings of congenital defect and ischemic injury to the heart.

93.    Mitchell's report claimed:

> The heart is removed aseptically and 11–grams of apex retained. The epicardium is smooth without injection or adhesion. It is lubricated by 1-2 ml of clear liquid. Coronary arteries have the normal course. Myocardium is red with even color. The ductus arteriosus is closed. The fossa ovalis is closed. Mitral and tricuspid valves, examined through the atrial orifices, are without redundancy.

94.    Later in his report, Mitchell's report claimed:

> Heart:       without significant pathologic lesion.

95.    These statements were false.

96.    Mitchell did not possess O.O.'s heart at the time of his autopsy.

97.    O.O.'s foramen ovale was patent and a fossa ovalis had not formed over the closed pathway.

98.    O.O.'s heart had suffered ischemic injury and was not without significant pathologic lesion.

99.    Defendants knew these statements were false, but knew they could not charge or convict Mrs. Buchhorn with the truth, and that without making these false statements, there would not be any evidence upon which to charge Mrs. Buchhorn with murder, let alone allege that a crime had even been committed.

100.    Despite possessing overwhelming evidence of Mrs. Buchhorn's innocence, Mitchell made these false statements to manufacture false evidence to frame Mrs. Buchhorn for the death of O.O.

101.     But before becoming Douglas County's District Coroner, Mitchell swore he would "faithfully, impartially and to the best of [his] skill and ability discharge the duties of District Coroner." K.S.A. 22a-226(d).

102.     Defendants interrogated Mrs. Buchhorn repeatedly, subjected her home, clothing, electronics, and documented communications to a rigorous forensic examination, and even interviewed other parents from the daycare to search for evidence of Mrs. Buchhorn's guilt. They obtained no inculpatory information from their efforts, however, because Mrs. Buchhorn was plainly innocent and no crime occurred.

103.     Nevertheless, Defendants schemed to blame Mrs. Buchhorn of murdering O.O.

**Defendants suppress evidence of Mrs. Buchhorn's innocence, in violation of *Brady***

104.     In 2015, the United States Court of Appeals for the Second Circuit published its opinion in *Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015), in which it ordered the district court to issue a writ of habeas corpus to Mr. Rivas based on ineffective assistance of counsel under *Strickland*.

105.     In the reversed case, "[t]he prosecution's case was almost entirely circumstantial and turned on the testimony of the Chief Medical Examiner, [] Mitchell." But yet, Mitchell changed his opinion to better fit the prosecution's theory and avoid Mr. Rivas' alibi—*six years later and on the basis of no new evidence*—while under criminal investigation in New York for misconduct, including theft of body parts.

106.     Defendants knew of these newspaper articles, or the facts underlying them, and of *Rivas*.

107.    Nevertheless and aware of the weakness of the case against Mrs. Buchhorn, they withheld this and other information from Mrs. Buchhorn and the relevant courts in violation of *Brady*.

108.    For example, Defendants concealed the cardiac autopsy report that fully exonerated Mrs. Buchhorn. Then Mitchell falsified documents and committed perjury to (i) further obscure the cardiac pathology report from discovery; and (ii) and conceal his lies about the condition of O.O.'s heart.

109.    Mitchell and Eudora PD suppressed and withheld further exculpatory information, the full extent of which is presently unknown to Plaintiffs, to advance their scheme of framing Mrs. Buchhorn for O.O.'s death.

110.    Defendants withheld all of the above-described information purposefully, to keep exculpatory information from Mrs. Buchhorn's defense and to ensure Mrs. Buchhorn's prosecution and conviction.

**Based on Mitchell's manufactured and suppressed evidence, Mrs. Buchhorn was charged, bound over, tried, convicted, and sentenced for murdering O.O. and sent to prison**

111.    On April 14, 2017, Defendants filed an Information alleging that Mrs. Buchhorn murdered O.O.

112.    The affidavit of Detective Flick, supporting the warrant for Mrs. Buchhorn's arrest, relied entirely upon Mitchell and his manufactured evidence of a magical electrical interruption theory of death.

113.    There was "no obvious motive" for Mrs. Buchhorn to murder O.O.

114.    The Information filed by Defendants relied entirely upon Mitchell, his manufactured evidence of a magical electrical interruption theory of death, and his suppression of exonerating material in violation of *Brady*, including, but not limited to, the cardiac autopsy report.

20

115.    During the preliminary hearing, Mitchell testified that "going on statistics," O.O. died instantaneously due to a blow to the head that had a "direct effect on depolarization of neurons at the area of the base of the brain, upper spinal cord manila, [which] interferes with the ability to breathe, and that leads to death."

116.    Mitchell claimed that O.O. died instantaneously from the injury so that the only potential suspect was the person with him at the moment of his simultaneous injury and death— Mrs. Buchhorn.

117.    Mitchell also claimed that "we know [] that we have a child who has no anatomic disease process or anatomic deformity or no anatomic reason to be dead other than the physical injury, and that this physical injury will release energy into the area that is critical for survival at the base of the brain, and that is, if you will satisfy, is the simplest most straightforward explanation."

118.    At trial, Mitchell again offered his blow-to-the-head-caused-a-cessation-of-breathing instantaneous cause of death theory.

119.    Also at trial, Mitchell claimed "the child has [a] normal heart…Just does not have any disease process to explain death. This child dies of trauma."

120.    These statements were false and constituted criminal perjury.

121.    These statements were made despite knowledge of the cardiac autopsy report.

122.    These statements were made to further Defendants' conspiracy to falsely convict Mrs. Buchhorn despite her known innocence.

123.    These statements deceived the district court into finding that probable cause existed to believe that a crime occurred and that Mrs. Buchhorn committed that crime.

124.    These statements also deceived a jury into believing that Mrs. Buchhorn murdered O.O.

125.    On July 26, 2018, the jury returned a verdict of guilty for murdering O.O., based on the only evidence offered by Defendants: Mitchell's perjury.

126.    Without Defendants' misconduct, Mrs. Buchhorn never would have been prosecuted for or convicted of O.O.'s death.

127.    But in continuance of their conspiracy, Defendants have failed and refused to acknowledge Mitchell's misconduct, discipline him, or prosecute him for his perjury.

### Post-conviction, Mrs. Buchhorn's new counsel exposes that Mitchell's cause of death theory was junk science

128.    Post-trial but pre-sentencing, Mrs. Buchhorn obtained new counsel.

129.    That new counsel exposed Mitchell's perjury with multiple expert witnesses.

### Dr. Kessler opines O.O. did not die from head trauma and Mitchell's "magical disruption of the brain" theory was "fantastical," resulting in "laughter" from colleagues

130.    Dr. Kessler is a licensed physician and board-certified pediatric neurologist.

131.    She is an Assistant Professor of Neurology and Pediatrics at the Perelman School of Medicine, the University of Pennsylvania, and the Children's Hospital of Philadelphia (CHOP), a quaternary care referral hospital which has consistently been ranked among the top children's hospitals in the US for many years. She has been in full time clinical practice since 2008 and is certified by the American Board of Psychiatry and Neurology in Neurology with special qualifications in Child Neurology (since 2007) and in Epilepsy (since 2013).

132.    Dr. Kessler is currently the program director of the Child Neurology residence and Pediatric Epilepsy Fellowship, where she teaches medical students, neurology residents, and epilepsy fellows, and has won teaching awards for this work. She is also a fellow of the American

Epilepsy Society, and Vice-Chair of the Self-Assessment Committee. In addition to caring for pediatric neurology patients on an outpatient basis, Dr. Kessler regularly works on impatient services, including consultation in the neonatal intensive care unit and caring for patients on the inpatient neurology ward. Through her research, Dr. Kessler also has expertise in invasive and noninvasive brain stimulation.

133.    Dr. Kessler is an ad hoc reviewer with the following editorials: Neuropediatrics (since 2009), Pediatric Neurology (since 2010), Epilepsy Research (since 2011), Brain Stimulation (since 2012), Cortex (since 2012), Epilepsia (since 2012), Brain and Language (since 2014), Cerebral Cortex (since 2014), and European Journal of Pediatric Neurology (since 2018). Dr. Kessler is also a member of the following **international** professional and scientific societies: American Academy of Neurology (since 2003), American Epilepsy Society (since 2008), Society for Neuroscience (since 2011), and Epilepsy Study Consortium (since 2014) and **nationally**: Child Neurology Society (since 2011).

134.    Dr. Kessler testified that Mitchell's cause of death theory was unreliable, and that scientifically, kinetic or mechanical energy (like a blow to the head) cannot impact the brain signals and stop breathing. Simply put, "Dr. Kessler was not aware of any circumstances in which mechanical energy directly translates into electrical charge in the brain." And, even more elementary, "Dr. Kessler had never heard or read about a brain death with no evidence of brain injury."

135.    "Dr. Kessler reviewed texts, published studies, and other sources of medical research, but she found no support for the proposition that mechanical energy can depolarize, interfere with, or disrupt the brain cells or nerves and cause instant death, without causing injury

to the brain. Dr. Kessler also reviewed the literature Mitchell produced posttrial and testified she

did not believe it supported Mitchell's theory." Dr. Kessler further noted:

> "[Mitchell's theory is] just fantastical, because it's not something I have ever been taught, not something I teach, not something—just not consistent. It's not consistent with the medical literature because there is no literature on magical disruption of the brain that causes death and that doesn't exist. In addition to looking though my own textbooks, looking through the two database searches I did, I was so taken aback by all this that I ... [asked] my colleagues if they have heard of this idea; and honestly, most of the time, the response that I got was laughter."

136. Dr. Kessler found "no reasonable medical or scientific basis to [Defendant's] theory

at all."

137. Dr. Kessler further opined:

> "There is substantial literature on the mechanisms by which head trauma leads to death, reflecting what is taught in modern medical education. These mechanisms include injury leading to bleeding, loss of blood flow or oxygen, cell death, brain swelling (a reaction to the trauma) which then leads to pressure on the vital centers of the brainstem responsible for basic functions such as breathing—which are processes that evolve minutes to hours to days, and leave pathologic evidence of injury in the brain."

138. Moreover, Dr. Kessler opined that Mitchell's testimony was "highly speculative"

and because he lacked the requisite education and training and was merely a "general anatomic

pathologist" and "medical examiner," he was "wholly unqualified to speculate about this topic."

139. Dr. Kessler testified, based upon the medical record, the only scientific certainty is

that the child's death was not caused by head trauma resulting from a blow to the head.

**Dr. Ng opines Mitchell's theory of death was "just not possible without any evidence that there was some brain injury," concluding O.O. did not die from head trauma**

140. Dr. Ng is a board certified neurologist with special qualification in child neurology,

board certified in Clinical Neurophysiologist and Epilepsy, a Professor of Pediatrics with Baylor

College of Medicine, Neurology Chief at The Children's Hospital of San Antonio, has published

more than 100 scientific papers in clinical pediatric neurology, is the Associate Editor for the journal *Pediatric Neurology*, and on the Scientific Research Committee for the Child Neurology Society and Annual Course Committee of the American Epilepsy Society.

141.    Dr. Ng testified:

"Whether it's from depolarization, which is some function, a sudden cessation of the whole brain, is just not possible without any evidence that there was some brain injury that would persist short of completely beheading the patient or cutting, disconnecting the upper brain stem, the medulla and all those brain parts to the spinal cord. I just can't fathom how a patient would have died with no evidence whatsoever of brain injury." 2021 WL 3578032, at *3 (cleaned up) (emphasis added).

142.    Dr. Ng also testified that Mitchell's theory diverged from medical science, that the articles Mitchell provided actually contradict his claim, and—fatally—that based on the evidence, O.O. did not die from a brain injury.

143.    Perhaps more fundamental, Dr. Ng opined that Mitchell, a general pathologist, is not authoritative or reliable within the medical profession regarding neurology and neurophysiology, and Mitchell's opinions on such matters would not be relied upon by other neurological specialists.

144.    But even if Mitchell could be relied upon regarding neurological matters, Dr. Ng confirmed there is no medical or scientific literature to support a theory of death by injury to the brain without visible injury to the brain.

**Ms. Craig, Esquire opines a neurologist was required to opine on Mitchell's cause of death theory**

145.    Ms. Craig is a professor at the University of Kansas School of Law and an attorney at the Paul E. Wilson Project for Innocence & Post-Conviction Remedies.

146.    In her testimony, Ms. Craig opined that a neurologist and potentially a biomechanical engineer were required to opine on the brain cessation theory.

### Dr. Wigren also opines a neurologist was required

147.    Dr. Wigren was the expert hired by Mrs. Buchhorn's trial counsel for the underlying criminal trial.

148.    At the post-trial hearing, Dr. Wigren testified that he was unaware of Mitchell's cause of death theory, and that Mrs. Buchhorn's trial counsel never asked him to address it. But, if he had been asked about the theory's viability, he would have recommended that trial counsel consult with a neurologist.

149.    Nevertheless, Dr. Wigren testified, he has never heard of this theory and was "unable to find any authoritative medical literature to support it."

### Mitchell admits he committed perjury

150.    Defendants called Mitchell at the post-trial hearing, who admitted that contrary to his prior representations to the court during the preliminary hearing, no "statistics" exist to support his cause of death theory.

151.    Mitchell also admitted that he could not provide the court with materials that evidence *anyone* dying from blunt force trauma without evidence of injury to the brain.

152.    Mitchell admitted that "depolarization" was something he came up with particular to support the prosecution of Mrs. Buchhorn.

153.    But despite Mitchell admitting to his perjury, Valdez, Seiden, the DA's Office, and Douglas County failed and refused to prosecute Mitchell.

### Dr. Hutchinson opines Mrs. Buchhorn lacks the psychological ability to murder a baby

154.    Dr. Hutchinson is a licensed psychologist with a masters and Ph.D. is counseling. She has always focused on trauma, which led her to "forensic psychology, where I am also a specialist in trauma and its impact on people's behavior."

155.    Forensic psychology applies psychological knowledge to forensic contests, situations, and question, which also involves testing to reach medical conclusions. Using these tests, Dr. Hutchinson has testified in over 90 criminal trials, about 60 civil cases, and throughout Kansas, Missouri, Iowa, Wisconsin, Arkansas, and 8 different federal jurisdictions.

156.    After testing Mrs. Buchhorn, Dr. Hutchinson opined:

a.    "There is nothing in [Mrs. Buchhorn's] psychological make up that would support a motive for intentionally harming a child or not seeking immediate help if an accident of some kind had occurred."

b.    "The intentional infliction of harm to a young child is beyond her comprehension and beyond the comprehension of those who know her."

c.    "The State's theory is contrary to Ms. Buchhorn's psychological make up…psychological testing [] shows no hidden areas of conflict."

d.    Especially "given the circumstantial nature of the state's theory and [lack of] evidence in this case; Ms. Buchhorn's stable psychological make-up is of utmost importance to consider."

157.    Dr. Hutchinson concluded "[w]ith a reasonable degree of psychological certainty, based upon my testing, evaluation and clinical experience, it is my opinion that it is extremely unlikely that Ms. Buchhorn intentionally caused harm to a young child in her care or that should would have failed to respond to any harm suffered by a child in her care. Her personality and history do not support this as probable."

**Mrs. Buchhorn's Conviction is Reversed and Remanded on Ineffective Assistance of Counsel Pursuant to *Strickland***

158.    Despite the foregoing testimony and evidence, on November 18, 2019, the district court denied Mrs. Buchhorn's motion for a new trial and sentenced her to 123 months.

159.    The district court's denial of Mrs. Buchhorn's post-trial relief constituted reversable error, and on August 16, 2021, the Kansas Court of Appeals reversed the district court and remanded the case pursuant to *Strickland*'s two-prong analysis. *State v. Buchhorn,* Case No. 122,252, 492 P.3d 507 (Table) (Kan. Ct. App. 2021).

160.    Defendants appealed the Kansas Court of Appeals' reversal to the Kansas Supreme Court, where the judgment of the Court of Appeals was affirmed. *State v. Buchhorn*, 316 Kan. 324, 515 P.3d 282 (2022).

**The district court, acknowledging that Defendants' abandonment of Mitchell eliminated the basis for the previous probable cause finding, orders a new preliminary hearing**

161.    On October 5, 2022, Defendants announced it had abandoned Mitchell and his cause of death theory.

162.    The district court's original September 17, 2017 probable cause determination that a crime had been committed was based, entirely, upon Mitchell's cause of death theory. *Id.* at ¶¶2-10.

163.    On November 1, 2022, the district court found that Mrs. Buchhorn's mere presence near the child when he died, without evidence of how the child died and how Mrs. Buchhorn killed the child, was insufficient to establish probable cause.

164.    Because the district court's original September 17, 2017 probable cause determination was entirely based on Mitchell's cause of death theory, the district court ordered a *new* preliminary examination (scheduled for January 17, 2023) and a jury trial (scheduled for March 13, 2023).

**With active, ongoing oversight by the Court of Appeals via a *habeas* petition, the district court dismisses criminal charges after Defendants were unable to meet the probable cause burden**

165.    As a result of the lack of proof of probable cause, *i.e.*, that a crime had been committed, or that Ms. Buchhorn had committed the crime, and her continued unconstitutional restraint in the absence of a finding of probable cause, Mrs. Buchhorn filed a Verified Petition for Writ of Habeas Corpus, seeking dismissal of the criminal charges and immediate release from continued unlawful detention. *Buchhorn v. Pokorny, et al.*, Case No. 125744 (Nov. 14, 2022).

166.    Defendants responded by seeking summary dismissal, claiming the district court erred by ordering a new preliminary hearing.

167.    The Court of Appeals rejected Defendants' theory, instead ordering Defendants to serve multiple status reports in the next four days, as the Court of Appeals closely monitored Mrs. Buchhorn's ongoing unconstitutional detention.

168.    The Court of Appeals' central focus was evidence supporting a finding of probable cause, specifically, Defendants' experts supporting probable cause, and Mrs. Buchhorn's constitutionally and statutorily required preliminary hearing:

> The court takes under advisement Petitioner Carrody M. Buchhorn's original petition for writ of habeas corpus. The court orders Respondent State of Kansas to serve and file a status report by 5:00 p.m. on December 14, 2022, stating whether its expert report is still due on December 16, 2022, and whether the preliminary hearing in *State v. Buchhorn*, No. 2017 CR 385 remains scheduled for January 17, 2023. If the preliminary hearing has been rescheduled, the State should include the new date. Respondent State of Kansas is further ordered to serve and file a status report by 5:00 p.m. on December 16, 2022, stating whether it has produced any required expert report. Respondent State of Kansas hereby has a continuing obligation to immediately inform this court of any changes to either the expert report submission or preliminary hearing dates. Petitioner may file a status report if the State fails to do so or to correct what she considers any material omission or inaccuracy in the State's report.

169.    On Friday, December 16, 2022, in its required report to the Court of Appeals, Defendants revealed it failed to timely submit its expert report from the requisite forensic pathologist.

170.    Simultaneously, Mrs. Buchhorn submitted a status report to the Court of Appeals:

a.    Advising the Court that the child abuse doctor "Frazier's report does not establish probable cause that a crime was committed, or that Mrs. Buchhorn committed that crime;"

b.    Complaining "Mrs. Buchhorn **still** has not been told of the nature and cause of the accusation against her, and the State continues to fail to supply probable cause that a crime was committed, much less that Mrs. Buchhorn committed that crime;" and

c.    Requesting Mrs. Buchhorn's immediate release from custody by rhetorically asking "How much longer [after more than 6 years] will Mrs. Buchhorn be unlawfully detained while the State tries to conjure up a theory that is a constitutional prerequisite to her detention in the first place?"

171.    Twelve minutes after Mrs. Buchhorn's status report, Judge Pokorny reported to the Court of Appeals that she *sua sponte* entered her order dismissing Mrs. Buchhorn's criminal case. Judge Pokorny's Order of Dismissal, attached to her status report, stated:

a.    "On October 5th, 2022, the State announced it was seeking a new expert for the case, and that it was abandoning Dr. Mitchell's theory of how O.O. died."

b.    "A status conference was held on November 1st, 2022. The Court set a hard and fast deadline for the State to disclose the new expert and the expert's report by December 16th, 2022. The Court asked the State if this would be enough time. The State did not ask for additional time."

c.    "According to pleadings filed this day by the defense, the State did provide a two page report from Terra Frazier, D.O. The defense claims this two page report fails to establish a cause of death, or a mechanism of death."

d.    "As a practical matter, this is a request for an extension within two weeks of the preliminary hearing setting on January 17th, 2023. This is an insufficient amount of time for the defense and the defense's experts to review the report from the State's experts."

e.    "The State was on notice to begin looking for an expert on August 31st, 2021, over a year ago. The State has had sufficient time to repair their case."

f.    "If the State receives a report from an expert that it believes will allow them to move forward with this case, they have the ability to file a new Information."

172.    Immediately thereafter, Defendants filed *another* status report with the Court of Appeals, threatening to "appeal the district court's dismissal order." But this turned out to be a hallow threat, despite filing a Notice of Appeal with the district court, Defendants never prosecuted an appeal of the dismissal of the criminal case, which is now deemed abandoned.

173.    On the following Monday, three days later, December 19, 2022, the Court of Appeals directed Mrs. Buchhorn and Defendants to file a status report, not later than 5:00 p.m., December 21, 2022, disclosing whether Mrs. Buchhorn was under any bond conditions or other restraints on her liberty. *Order*, Case No. 125744 (Dec. 19, 2022).

174.    Defendants reported there were no conditions of release but advised that it had filed a notice of appeal of the district court's dismissal. *Status Report [I]* Case No. 125744 (Dec. 21, 2022).

175.    On January 5, 2023, following receipt of Dr. Turner's report, both Defendants and Mrs. Buchhorn filed additional status reports, advising the Court of Appeals that Defendants'

forensic pathologist had concluded there was no crime. Specifically that (1) the parties were in receipt of Defendants' "forensic pathologist's outstanding expert report" from Dr. Jane Turner; (2) Dr. Turner—in her 11 page report—had found the child died of natural causes from "a congenital heart defect that predisposed him to pathophysiologic processes that began at least 12-24 hours before his death;" (3) the long-touted fracture at the back of the skull "pre-exist[ed] [the child's] illness and was non-lethal, asymptomatic, and without pathologic sequelae;" (4) concluding "It is my opinion, held within a reasonable degree of medical certainty, that [the baby] died from natural disease and pathophysiological processes unrelated to child abuse;" and (5) stating "the State [] has ultimately determined that it will no longer move forward with docketing its appeal or otherwise prosecuting [Mrs.] Buchhorn for O.O.'s death. The State memorialized this intent in a press release prepared and issued late last night." *Status Report [II]* Case No. 125744 (Dec. 21, 2022).

176.     As a result, the same day, the Court of Appeals—based on the fact that "[t]he State has not refiled criminal charges against [Mrs.] Buchhorn and the Douglas County District Attorney reported to us earlier today that she has no present plans to do so"—the Court of Appeals ordered Mrs. Buchhorn to show cause why the habeas matter was not moot. *Order to Show Cause*, Case No. 125744 (Jan. 5, 2023).

177.     In response to the show cause order, Defendants represented they had "since publicly announced its intent to cease further prosecution. The only controversies raised by [Mrs.] Buchhorn's petition have thus ended. A favorable judgment on the merits of her [habeas] petition can afford her no additional relief." *State's Response to Order to Show Cause* Case No. 125744 (Jan. 12, 2023) at ¶5.

178.    In reliance on Defendants' representations, the Court of Appeals dismissed Mrs. Buchhorn's habeas action. *Order of Dismissal* Case No. 125744 (Jan. 17, 2023).

**Demonstrating confidence that their conspiracy would work and Mrs. Buchhorn would spend years in prison, Defendants steal Mrs. Buchhorn's laptop computer**

179.    On October 1, 2016, Eudora PD executed a search warrant and seized the clothes Mrs. Buchhorn had worn the day O.O. died, including her tennis shoes, K-State shirt, and black pants.

180.    Despite knowing Mitchell's claim that Mrs. Buchhorn killed the child by stomping on the back of his head, Defendants never tested Mrs. Buchhorn's shoes for DNA that could be used to prove whether Mrs. Buchhorn had taken so violent and abhorrent an action.

181.    On October 5, 2016 at 4:44 p.m., the district court issued a search warrant for Plaintiffs' home for electronic devices "for the purpose of recovering chats, emails, pictures, and Internet search activity related to death and death investigation of O.O."

182.    In executing that search warrant, Eudora PD seized a MacBook Pro owned by Mrs. Buchhorn with serial number C02QD0LAFVH5.

183.    Eudora PD Detective Daniel Flick signed the Inventory of Property Seized and Receipt For Same as the "Officer in Charge of Search." Three separate indecipherable names are listed as "Persons Present During Search."

184.    Five years later, on December 19, 2022, after all criminal charges against her had been dismissed, Mrs. Buchhorn asked the Sheriff's Office to return her personal property. Mrs. Buchhorn was told to contact the DA's Office, who had to first authorize release of her property.

185.    Alerted to this, Defendant Seiden responded that (i) Douglas County had filed a notice of appeal, "so the case is still pending. If there are any items of evidentiary value, they will

not be released. Please forward me a list of the items, including property numbers, that your client wishes to have released."

186.    None of Mrs. Buchhorn's seized property was introduced as evidence in her criminal trial.

187.    Minutes after Seiden's email, Mrs. Buchhorn's counsel responded:

> Mr. Seiden
> Her laptop computer, clothing including her shoes, pants and a shirt, indeed anything in the State's possession that belongs to Mrs. Buchhorn.  Concerning the computer, the State has had plenty of time to download anything it has a right to take.  We would like the computer returned, together with a copy of anything taken from it.  Please provide a list of anything which is being held because the State claims it has evidentiary value.
> William Skepnek

188.    In response, Seiden stated: "You have received discovery, which would include a property log. Please provide the property numbers of the items you are seeking returned."

189.    But Seiden was wrong—Defendants had not provided Mrs. Buchhorn's counsel with any property logs.

190.    Even though Mrs. Buchhorn had not received any property logs and requested *all* of her property still seized, Seiden nonetheless required Mrs. Buchhorn to needlessly file a motion to obtain her property that Defendants continued to unconstitutionally retain.

191.    As a result, on December 21, 2022, Mrs. Buchhorn filed a Motion for Order Releasing Property Unlawfully Held.

192.    On December 27, 2022, the district court asked Seiden if he intended to file a response.

193.    Before responding to the district court, Seiden emailed Mrs. Buchhorn's counsel a copy of "the evidence log in this matter," then told the district court he would not respond, but had

given Mrs. Buchhorn the evidence log and placed the burden on her to identify "items in the log they believe should be returned."

194.    The "evidence log" that Seiden gave to Mrs. Buchhorn's counsel was erroneous and incomplete. The document stopped at Number 23 and did not reference or include Mrs. Buchhorn's seized laptop.

195.    On January 17, 2023, Mrs. Buchhorn's counsel conducted a call with the DA's Office, during which the DA's Office represented:

    a.    The DA's Office previously instructed Eudora PD to release all of Mrs. Buchhorn's property on January 13, 2023;

    b.    Mrs. Buchhorn's laptop was logged with an erroneous typo in the case number, but the error had been corrected; and

    c.    Mrs. Buchhorn could immediately retrieve all of her property from Eudora PD.

196.    Despite Mrs. Buchhorn's counsel's request, the DA's Office refused and failed to produce the evidence log that contained an "erroneous typo in the case number" nor produced a corrected evidence log.

197.    Nonetheless, that day, January 17, 2023, Mrs. Buchhorn went to Eudora PD's office:

    a.    A receptionist identifying herself as Melody Buchholz immediately told Mrs. Buchhorn that Eudora PD did not possess Mrs. Buchhorn's laptop;

    b.    Ms. Buchholz stated that she and Eudora PD Detective Flick looked for Mrs. Buchhorn's laptop after the DA's Office told Eudora PD that it could release Mrs. Buchhorn's property and specifically mentioned the laptop, but the laptop could not be located;

      c.    Ms. Buchholz stated she possessed a serial number, but could not verify that it was the correct serial number for Mrs. Buchhorn's laptop;

      d.    Ms. Buchholz stated Eudora PD possessed a chain of custody form listing "Carrody's Laptop" as "Number 26;"

      e.    Mrs. Buchhorn responded she had received a chain of custody form from the DA's Office that (i) omitted her laptop; and (ii) did not include "Number 26," and instead stopped at "Number 23;"

      f.    Ms. Buchholz stated she had originally sent the DA's Office the "wrong log," but resent the "correct log" to the DA's Office immediately after she realized her error;

      g.    Ms. Buchholz explained that that DA's Office had previously taken Mrs. Buchhorn's laptop, but failed to return the laptop to Eudora PD;

      h.    Ms. Buchholz also explained that the typical Eudora PD policy was to immediately make a copy of a computer's hard drive and then return the electric devices, *not* to seize and maintain possession over electronic devices throughout a defendant's prosecution and imprisonment.

      i.    Mrs. Buchhorn requested a copy of the chain of custody form showing her laptop, and Ms. Buchholz stated she had given a copy of this form to the DA's Office, who should have already sent it to Mrs. Buchhorn's attorneys.

198.    Mrs. Buchhorn left Eudora PD with her pants, shoes, and shirt, which were ruined by apparent handling and use by Defendants.

199.    Later the same day counsel for Mrs. Buchhorn informed the DA's Office of this interaction with Eudora PD, and asked:

> Why are there multiple evidence logs? Please provide the evidence log our client was shown today.
>
> And most importantly, where is our client's laptop?

200.    Responding days later to the request for return of the missing laptop, Seiden stated: "While that is undeniably problematic, it is simply not a problem that the District Attorney's Office can resolve. This office is responsible only for directing law enforcement to hold and/or release evidence; this office is not responsible for dictating policy as to how each individual law enforcement agency stores such property after a conviction. If Buchhorn intends to seek recourse for the loss of said laptop, it is a matter which would be more appropriately addressed by the agency tasked with its storage, not this office."

201.    Eudora PD had represented to Mrs. Buchhorn that the DA's Office—not Eudora PD—had last been in possession of the laptop and had failed to complete a chain of custody form acknowledging taking the laptop.

202.    To date, Defendants have refused and failed to return Mrs. Buchhorn's Macbook laptop computer.

**Dr. Jane Turner exposes the conspiracy, revealing O.O. died of natural causes**

203.    Because of their fear that their conspiracy and unconstitutional misconduct would become exposed, despite the district court's dismissal, and their acknowledgment that they could not proceed with the prosecution, Defendants did not cease their public accusations that Mrs. Buchhorn was a murderer.

204.    Following reversal of Mrs. Buchhorn's conviction, the DA's Office, by and through Valdez and Seiden, hired Dr. Jane Turner, M.D. to evaluate Mitchell's work and create a cause of death.

205.    Upon information and belief, Seiden and Valdez expected and anticipated that Dr. Turner would return a favorable report, supporting the murder accusation, regardless of the evidence.

206.    But Dr. Turner surprised them.

207.    On January 3, 2023, Defendants received Dr. Turner's report, which exonerated Mrs. Buchhorn, finding that the child died of natural causes.

208.    Dr. Turner is eminently qualified, having practiced forensic pathology for over 20 years.

209.    She is certified in anatomic and clinical pathology and in forensic pathology from the American Board of Pathology.

210.    A professor at both the St. Louis University School of Medicine and McMaster University, she is also the founder and moderator of the forensic pathology—trauma surgery monthly clinicopathology correlation conference at St. Louis University Hospital and the course director of an elective for medical students on forensic pediatric pathology.

211.    Having performed over 5,000 autopsy examinations to determine cause and manner of death, Dr. Turner has specifically performed autopsies on hundreds of infants and children and thousands of trauma cases.

212.    Dr. Turner has testified in criminal proceedings hundreds of times, lectured on forensic pediatric pathology (including trauma and injuries), repeatedly been published on pediatric deaths, and co-authored three chapters in a published book on sudden unexplained pediatric deaths.

213.    Most recently, Dr. Turner was appointed to a committee of forensic pathologists from the National Association of Medical Examiners and pediatricians from the American

Academy of Pediatrics, charged with researching the current state of knowledge regarding sudden unexplained pediatric deaths.

214.    Concerning the finding that the child had a patent foramen ovale, Dr. Turner wrote "The autopsy finding of a patent foramen ovale is significant in that this congenital heart defect put O.O. at risk for a lethal arterial stroke. Such a stroke is ischemic and, therefore, undetectable at autopsy when the death is sudden."

215.    She wrote: "[t]he most common cause of myocardial infarction in infants is paradoxical embolism resulting in occlusion of a coronary vessel; the most common cause of paradoxical embolism is patent foramen ovale."

216.    And she wrote: "[t]he findings of myocardial infarction and hemorrhage of the carotid artery sheath are evidence of paradoxical embolization from the p[atent] f[oremen] o[vale]; involvement of the carotid artery indicates embolization of blood clots from the heart to the head and brain...Arterial ischemic stroke from paradoxical embolism is often referred to as cryptogenic stroke. Arterial ischemic stroke can cause sudden death."

217.    And: "[n]either Dr. Mitchell nor Dr. Wigren found acute hemorrhage of the dura. In fact, the autopsy found no injuries of the brain commonly associated with lethal traumatic brain injury: no massive cerebral edema with herniation, no epidural hematoma, no subdural hematoma, no subarachnoid hemorrhage, and no cerebral contusions or lacerations."

218.    Dr. Turner concluded:

It is my opinion, held within a reasonable degree of medical certainty, that Oliver Ortiz died from natural disease and pathophysiologic processes unrelated to child abuse. Specifically, Oliver had congenital heart disease (patent foramen ovale (PFO)), that put him at risk for blood clots to travel from the right side of the heart to the left side of the heart to cause injury by blocking blood flow in the coronary arteries, resulting in myocardial infarction. This pathophysiologic process is known as paradoxical embolism. One of the greatest—and most common--risks of having a PFO with paradoxical embolism is that blood clots can also travel to blood vessels in the brain, blocking blood flow and causing arterial ischemic stroke; likewise, blood clots can travel to blood vessels in soft tissues and skin and cause injury such as hemorrhage, mimicking bruises. The microscopic evidence indicates that the heart injury occurred 12 to 24 hours before Oliver died. While it is possible Oliver died from the paradoxical embolism injury to the heart alone, the various hemorrhages in the scalp which developed over time as he was being resuscitated-- plus the hemorrhage around the carotid artery—suggest that Oliver sustained additional and continued paradoxical emboli from the heart to the head—including the brain-- by way of the carotid arteries. Notably, acute arterial ischemic stroke cannot be ruled out by autopsy as there are no visible anatomic changes to the brain grossly or microscopically in cases of sudden death; such changes are not apparent for 6 to 12 hours after the insult (In: *Robbins Basic Pathology* (10th ed.)) Nonetheless, Oliver had risk factors for developing an arterial ischemic stroke, and there is autopsy evidence of paradoxical embolism. Oliver's risk factors for developing blood clots include blood infection (sepsis), and possible ear infection, either of which can incite an acquired coagulopathy such as disseminated intravascular coagulation. Furthermore, Oliver's hyperglycemia may represent undiagnosed diabetes and resultant diabetic ketoacidosis which further exacerbated his condition. It is also my opinion that Oliver's liver laceration and other abdominal and cutaneous injuries are consistent with injuries from CPR.

219.    Dr. Turner summarized: "[i]n short, the evidence from the autopsy indicates that O.O. had a congenital heart defect that predisposed him to pathophysiologic processed that began at least 12-24 hours before his death, and which continued and progressed as he was being resuscitated. He had hyperglycemia, hypothermia, and bacterial and viral infections at the time of his death. The skull fracture pre-existed O.O.'s illness and was non-lethal, asymptomatic, and without pathologic sequelae. The liver laceration and bruising on the chest and abdomen are injuries consistent with injuries caused by cardiopulmonary resuscitation."

220.    Because O.O. died of natural causes, the child could not have been murdered, and Mrs. Buchhorn is actually innocent.

**With no criminal charges pending, Valdez and Seiden issue a statement falsely accusing Mrs. Buchhorn of murdering O.O.**

221.    After receiving Dr. Turner's report, Valdez and Seiden met for hours and spoke repeatedly to decide how they could manipulate Dr. Turner's findings to allow them to continue the prosecution of Mrs. Buchhorn. Finally, after concluding they lacked a path to prosecute Mrs. Buchhorn because Dr. Turner's report determined O.O. died of natura causes, Valdez decided that the DA's Office would cease prosecuting Mrs. Buchhorn.

222.    Valdez and Seiden then began an effort to publicly "spin" the report to exonerate their own conduct while shifting blame to others, hiding Defendnats' as an exoneration of themselves while blaming others, hiding the repeated constitutional violations, and continuing to claim Mrs. Buchhorn was a murderer.

223.    As a result, they prepared a statement, which they released on January 4, 2023, entitled "*District Attorney Suzanne Valdez's Statement on State of Kansas vs. Carrody Buchhorn, Case No. 2017-CR-385*" (the "January 4, 2023 Statement").

224.    Seiden primarily drafted the language in the January 4, 2023 Statement, but Valdez approved of its content and authorized its publication on the DA's Office's letterhead.

225.    The January 4, 2023 Statement was published after all criminal charges against Mrs. Buchhorn were dismissed, and at the time of its publication, no criminal charges or case existed against Mrs. Buchhorn.

226.    The January 4, 2023 Statement:

a.    Blamed Douglas County and not Valdez or the DA's Office for hiring Mitchell;

b.    Claimed the DA's Office believed it "prudent to contract with independent experts," and not Mitchell;

41

c.     Admitted Mitchell's repeated misconduct was widely known and "fully chronicled in both local and national media;"

d.     Confessed Mitchell's reputation was so low and his impeachment so likely if Defendants properly disclosed *Brady* material, that Valdez had refused to use "Mitchell as a witness of any sort;"

e.     Admitted Dr. Turner—hired by the DA's Office—had found "within a ***reasonable degree of medical certainty***, that O.O. died from natural disease and pathophysiologic processes unrelated to child abuse;" (emphasis in original) and

f.     Falsely alleged, despite Dr. Turner's finding that no crime occurred, there was "other evidence to support prosecution."

227.   This is not the first time Valdez and Seiden have worked together to issue false and injurious public statements.

228.   For example, only two months after taking office, Valdez issued a statement implying the Chief Judge of the Douglas County District Court had made false assertions. She also made a disparaging Facebook post and sent the Chief Judge improper and inappropriate text messages.

229.   A formal disciplinary complaint was filed against Valdez in August 2023 by a special prosecutor for the Office of the Disciplinary Administrator. The special prosecutor requested a one-year suspension of Valdez's law license. In December 2023, a panel of attorneys heard evidence over three days, ultimately issuing a report that found Valdez violation KRPC 35(d) twice—first with the statement and second with the Facebook post.

230.   Nor was this Valdez's only disciplinary matter.

231.    The Douglas County Sheriff filed a complaint with the Office of the Disciplinary Administrator because Valdez was subpoenaing the Sheriff and Undersheriff in every criminal case involving the Sheriff's Office. A review committee directed that Valdez be cautioned, and the letter from the Chief Deputy Disciplinary Administrator warned such conduct "seems excessive and could constitute a violation of KRPC 4.4(a).

232.    Valdez and Seiden's attempts to control, prevent, manipulate, and falsify the free press' ability to report facts has been repeated. For example, Seiden, as a government attorney, alleged "the sad reality is that the Lawrence Journal-World is a fledgling publication devoid of journalist integrity and constantly on the prowl for potential clickbait." In denying the DA's Office's attempt to prevent the newspaper's access to an affidavit, the District Court Judge opined that "the State's position on whether the LJW meets the State's standards for journalistic integrity is irrelevant to the analysis. It is, however, relevant to the purpose of the First Amendment—to protect against government actors deciding what news stories they find acceptable."[4]

233.    Valdez has stated that she published the January 4, 2023 statement because, she believes, she is required to "correct the narrative," by which Valdez means bad press. In this case, Mrs. Buchhorn is a victim of Valdez's ongoing efforts to create good press for herself, at the expense of innocent citizens.

**Without Any Criminal Charges Pending, Valdez and Seiden Make a Public Presentation in which They Falsely Claim Mrs. Buchhorn Murdered O.O.**

234.    On February 4, 2023, Valdez and Seiden made a public presentation on "prosecutorial discretion" to a group of concerned citizens of Douglas County (the "February 4, 2023 Presentation").

---

[4] *Kansas judge rejects prosecutor's attempt to seal affidavit by insulting newspaper*, Kansas Reflector, Sept. 19, 2023, *available at* https://kansasreflector.com/2023/09/19/kansas-judge-rejects-prosecutors-attempt-to-seal-affidavit-by-insulting-newspaper/.

235.    The presentation used the logo of the Douglas County District Attorney's Office, and Valdez and Seiden used their government titles during the presentation.

236.    The February 4, 2023 Presentation was conducted *after* all criminal charges against Mrs. Buchhorn had been dismissed, and at the time it was made, no criminal charges or case existed against Mrs. Buchhorn.

237.    During the February 4, 2023 Presentation, Valdez and Seiden represented:

      a.    Mitchell lied in the prosecution of Mrs. Buchhorn;

      b.    Mitchell has credibility issues, "that's why I won't use Dr. Mitchell; I won't use his testimony;"

      c.    Defendants possessed a child abuse expert who claimed O.O. was abused by Mrs. Buchhorn;

      d.    When questioned about her conduct being incongruent with publicly reported facts, "If you believe the newspaper, then that's a problem";

      e.    "there is other evidence that we cannot comment on—believe me—there was other evidence;"

      f.    "[b]ased on the evidence that we saw…I have reviewed all of these cases that have come before me. We had the evidence to go forward;"

      g.    "[t]here was other evidence at trial" that evidenced Mrs. Buchhorn's guilt;

      h.    Despite Dr. Turner's opinion that no crime even occurred, "she's not exonerated. That's another thing I want to make clear, okay?" and

      i.    "We believe, after Dr. Mitchell, there is other evidence to support going forward. I was not going to go forward, I'm going to end it there. I've never called Dr. Mitchell. I will not use Dr. Mitchell."

238.    During the February 4, 2023 Presentation, Valdez was asked pointedly how she could continue to defend a conviction on appeal and post-remand when she knew Mitchell's cause of death theory was junk science. In response, Valdez began "because there was actually," but stopped herself, turned to Seiden, and asked "I don't know if I can comment on it. Can I comment on it?" At that time, Seiden stated that Justice Rosen's comment about Mitchell's theory being "bunk" was merely "unsolicited commentary. That was not an issue before the Court."

239.    The interplay between Valdez and Seiden was designed—and succeeded—in causing the public to believe that Valdez and Seiden possessed secret evidence that Mrs. Buchhorn was guilty of murdering a nine-month-old baby in her care.

240.    But there is no such secret evidence, and both Valdez and Seiden knew they had nothing to reveal.

241.    Also during the February 4, 2023 Presentation, Valdez acknowledged that *Brady* and *Giglio* applied to Mitchell, and stated "I'm not using him because of the *Brady/Giglio* component."

### The Municipality Defendants Caused Plaintiffs' Injuries

242.    The constitutional violations detailed above against Plaintiffs were not anomalous or isolated acts of misconduct, nor were they unknown to Municipality Defendants. They were intentional and/or resulted directly from the Municipal Defendants' customs, policies, or practices; failures to adequately train and supervise its employees and agents; and ratification of unconstitutional conduct and fostering a culture of wrongful convictions and perjury, notwithstanding prosecutors openly admitting the existence of Municipality Defendants' misconduct.

**Informal policies, procedures, and customs created widespread abuse of government authority**

243.    The similarity and pattern of lies, deceptions, and constitutional violations between the Municipal Defendants' employees, over time, and across administrations, further evidences the Municipal Defendants' customs, policies, or practices.

244.    Municipal Defendants, by and through their final policymakers, knew about this conduct, and its informal policies and customs permitted this conduct by Municipal Defendants' employees.

245.    Despite its actual or constructive notice of these constitutional violations, the Municipal Defendants refused and/or failed to make any meaningful investigation into the charges that its employees committed the misconduct described above.

246.    Municipal Defendants, by and through its final policymakers, also had actual or constructive notice that widespread and systematic failures to train, supervise, or discipline its employees for misconduct, including *Brady* violations, fabrication of evidence, perjury, and nonexistent theories of death, enabled its employees to engage in misconduct and false convictions without repercussion. The Municipal Defendants' continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of Plaintiffs and similar citizens.

247.    Informal policies, procedures, and customs created a widespread practice of employees abusing government authority and wrongfully convicting innocent citizens, including Mrs. Buchhorn.

248.    Municipal Defendants, through their continued encouragement, ratification, and/or approval of the forementioned informal policies, practices, and/or customs, in spite of their known

and obvious inadequacies and dangers, were deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

249.    The Municipal Defendants', by and through its final policymakers, at all times relevant to this Complaint and covering years, including to the present, maintained informal policies, procedures, and/or customs that permitted its employees to (i) commit willful, intentional *Brady* violations; (ii) commit perjury without fear of prosecution; (iii) utilize improper investigative practices to obtain wrongful convictions; and (iv) discourage, prevent, and fail to investigate complaints of misconduct.

**Failure to adequately train and supervise its employees permitting the misconduct**

250.    The Municipal Defendants', by and through its final policymakers, at all times relevant to this Complaint and covering years (including to the present), failed to adequately train and supervise its employees. As a direct result, Municipal Defendants' employees, including Mitchell, Valdez, and Seiden, were permitted to commit the unlawful acts described above.

251.    Municipal Defendants were repeatedly informed of the pattern of constitutional violations against Plaintiffs, putting Municipal Defendants on notice that their employees— including Mitchell, Valdez, and Seiden—needed training. Despite this, Municipal Defendants failed to provide any training or supervision in an effort to stop this documented misconduct. This constitutes deliberate indifference to the known previous and risk of future constitutional harms that Municipal Defendants' lack of training posed to citizens in the community.

252.    Municipal Defendants failed to implement adequate training, guidelines, and supervision to: (i) prevent willful, intentional *Brady* violations; (ii) prosecute perjury by Municipal Defendants' employees and agents; (iii) ensure proper investigative practices were used to prevent wrongful convictions; and (iv) encourage, prevent, and investigate complaints of misconduct. The

lack of adequate and appropriate supervision of Municipal Defendants' employees and agents, including Mitchell, Valdez, and Seiden, and the failure to discipline and train them to report the misconduct of themselves and their colleagues, demonstrates a deliberate indifference toward the known risks that individuals would be accused and convicted of crimes that they did not commit.

253. Municipal Defendants, knowingly permitted Mitchell, Valdez, and Seiden to violate the constitutional rights of citizens with impunity. With little or no check on their conduct, Mitchell, Valdez, and Seiden used the power of their title and office to satisfy personal vendettas, protect favored individuals (including Mitchell) from criminal liability for perjury, and frame and falsely convict innocent people. No supervisor acted to prevent this through appropriate discipline or supervision, and there was no training provided to deter Mitchell, Valdez, or Seiden from their constant and egregious violations of citizens' constitutional rights, or to require other employees to report such misconduct.

254. Municipal Defendants, through their continued encouragement, ratification, and/or approval of the aforementioned lack of training, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

**Municipality Defendants ratified the conduct and fostered the culture**

255. Despite knowledge of the foregoing, Municipal Defendants continued to reward and promote, rather than discipline, Mitchell, Valdez, and Seiden and ratified unconstitutional conduct which fostered a culture of abuse.

256. Municipal Defendants also ratified other unconstitutional conduct by permitting it to occur openly and brazenly without any repercussions. Instead, for example, Douglas County agreed to allocate *more* money to the DA's Office to address multiple complaints and ethics investigations of Valdez's and Seiden's misconduct.

257.    Municipal Defendants, through its continued encouragement, ratification, and/or approval of the aforementioned policies, practices, and/or customs, in spite of their known and obvious inadequacies and dangers, was deliberately indifferent to Plaintiffs' and other victims' constitutional rights.

**Valdez openly admitted to the known existence of this culture of unconstitutional misconduct**

258.    Valdez has acknowledged the existence of the Municipal Defendants' policies, procedures, and customs.

259.    On December 28, 2020—before even becoming sworn in as the District Attorney of Douglas County—Valdez represented that when she takes office, she would inherit many "botched cases" and "need every bit of luck I can get."

260.    Particularly telling is Valdez's open and nearly cavalier acknowledgment of the repeated constitutional violations within Municipal Defendants.

261.    So well known are these policies, procedures, and customs that despite still being in orientation, Valdez knew that cases were "botched" and constitutional rights violated.

262.    But even though Douglas County's District Attorney readily admitted to these constitutional violations, the Municipal Governments (and Valdez herself while District Attorney) continue to fail to seriously investigate the constitutional violations occurring on their watch.

**Aware of her innocence, Mrs. Buchhorn is subjected to cruel and unusual punishment in Douglas County's jail while being forced to babysit a suicidal prisoner to save the County the trouble and cost of suicide watch**

263.    While in Douglas County's jail, Mrs. Buchhorn was forced to share a 6 by 8 cell, 23 hours per day, with Scharron Dingledine, a suicidal prisoner who on August 3, 2018, had driven her vehicle into the Kansas River near Lawrence, Kansas with her 1-year-old son and 5-year-old daughter in the car. Dingledine's daughter was found dead the following day.

49

264.    For approximately seven months, excepting just 2 nights, Mrs. Buchhorn was forced to remain inside a 6-foot by 8-foot cell with Dingledine for 23 hours per day.

265.    Mrs. Buchhorn was repeatedly forced to prevent Dingledine (who was verbally and emotionally abusive to Mrs. Buchhorn) from committing suicide, acutely afraid that if Dingledine succeeded in killing herself, she would be blamed for it.

266.    Mrs. Buchhorn repeatedly asked to be separated from Dingledine, but she was always refused by Douglas County jailers. During one request, Mrs. Buchhorn was offered a pizza if she would quit asking to be moved. Mrs. Buchhorn rejected the bribe.

267.    During another request, Mrs. Buchhorn was informed that she could not move to a different cell, because if Dingledine did not have a cellmate, she would have to be placed on suicide watch. Suicide watch required Douglas County's jailers to constantly keep eyes on an inmate within a specially padded and equipped room. When Mrs. Buchhorn retorted "so I'm doing your job for you," the Douglas County jailer responded "yeah, basically."

268.    As soon as Mrs. Buchhorn's babysitting skills were no longer needed, she was given the lowest security level possible and placed in a largely autonomous area without a cell. As evidence that Mrs. Buchhorn was kept in these conditions to perform Douglas County's jailers' job for them, and not due to any other justification related to Mrs. Buchhorn, the day that Dingledine was transferred out of Douglas County's jail, Mrs. Buchhorn was immediately downgraded to medium security (with 4 hours out of her cell), and then minimum security (with 4 hours out of her cell). Without the need to use her to watch Dingledine, Mrs. Buchhorn was then trusted with a coveted laundry job where she slept outside of a cell on a cot, and ultimately moved to the facility laundry, where she worked at night and slept in the annex bubble during the day.

269.    Mrs. Buchhorn was forced to babysit a suicidal prisoner because Douglas County recognized that Mrs. Buchhorn was sane, not a criminal, and would do the right thing.

270.    As soon as Mrs. Buchhorn's babysitting skills were no longer needed, she was given the lowest security level possible and placed in a largely autonomous area without a cell.

## DAMAGES

271.    As a direct result of the aforementioned wrongful conduct (occurring for years and inflicted through Defendants' intentional, bad faith, willful, wanton, reckless, and/or deliberately indifferent acts and omissions), Plaintiffs sustained injuries and damages which continue to date and will continue into the future, including: physical pain and suffering; severe mental anguish; emotional distress; destruction of family relationships; severe psychological damage; loss of property; legal expenses; loss of income and career opportunities; humiliation, indignities, and embarrassment; degradation; and permanent loss of natural psychological development, for which Plaintiffs are entitled to monetary relief.

272.    Additionally, the emotional pain and suffering caused by Defendants has been substantial. Since the first false allegation was levied against her, Mrs. Buchhorn and her familial co-Plaintiffs were stripped of the various pleasures of basic human experience, from the simplest to the most important, which all free people enjoy as a matter of right, including the fundamental freedom to live one's life as an autonomous human being without fear that the government will falsely tell the public that you murdered a baby and falsely convict you for that crime which did not even happen in the first place.

273.    As a result of Defendants' conduct, Mrs. Buchhorn was subjected to repeated searches and seizures and wrongfully imprisoned and her liberty restrained from April 14, 2017 to December 16, 2022, for a total of 2,072 days.

**DEFENDANTS INTERFERED WITH PLAINTIFFS' CARE, CUSTODY, AND CONTROL OF THEIR CHILDREN, A FUNDAMENTAL LIBERTY INTEREST PROTECTED BY THE UNITED STATES CONSTITUTION AND THE KANSAS CONSTITUTION**

274.    The Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." The Amendment's Due Process Clause "guarantees more than fair process," and includes a substantive component that "provides heightened protection against government interference with certain fundamental rights and liberty interests."[5]

275.    "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court."[6] Similarly, the Kansas Constitution requires that mothers are provided "for their equal rights in the possession of their children."[7]

276.    The protected liberty interest is independently held by both parent and child, and it also exists between husband and wife.[8]

277.    Mrs. Buchhorn assumed parental responsibilities over her children and therefore possessed a fundamental right to raise her children and benefit from their society. Similarly, Mrs. Buchhorn assumed spousal responsibilities with her husband and therefore possessed a fundamental right to benefit from his society. In furtherance of Defendants' wrongful conviction of an innocent woman, Mrs. Buchhorn's parental responsibilities over her children and spousal relationship with her husband were interfered with while she was wrongfully imprisoned.

---

[5] *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997).
[6] *Troxel v. Granville*, 530 U.S. 57, 65 (2000).
[7] Kan. Const. Art. XI, § 6; *Matter of Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018).
[8] *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037 (9th Cir. 1999) (en banc); *Trujillo v. Bd. of Cnty. Com'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1190 (10th Cir. 1985).

278.    Plaintiff Timothy Buchhorn assumed spousal responsibilities with his wife and therefore possessed a fundamental right to benefit from her society. In furtherance of Defendants' wrongful conviction of Mrs. Buchhorn, Mr. Buchhorn's spousal relationship with his wife was interfered with while Mrs. Buchhorn was wrongfully imprisoned.

279.    Plaintiff Gregory Snell possessed a fundamental right to be raised by his mother and benefit from her society. In furtherance of Defendants' wrongful conviction of an innocent woman, Plaintiff Gregory Snell's parental relationship with his mother was interfered with while Mrs. Buchhorn was wrongfully imprisoned.

280.    Plaintiff Matthew Buchhorn possessed a fundamental right to be raised by his mother and benefit from her society. In furtherance of Defendants' wrongful conviction of an innocent woman, Plaintiff Matthew Buchhorn's parental relationship with his mother was interfered with while Mrs. Buchhorn was wrongfully imprisoned.

281.    Defendants, as documented through their intentional conduct above, intended to deprive Plaintiffs of these constitutional rights.

282.    Thus, Defendants violated Plaintiffs' fundamental rights without due process of law.

<u>**CLAIMS FOR RELIEF**</u>

283.    Each Defendant benefitted financially and/or received something of value from the misconduct detailed above. As a result, Defendants are liable for the following causes of action:

**COUNT 1**
**Fabricating and Perpetuating a Knowingly False and Nonexistent Cause of Death in Violation of 42 U.S.C. § 1983**

**(BY MRS. BUCHHORN AGAINST MITCHELL, VALDEZ, AND SEIDEN)**

284.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

285.    Mrs. Buchhorn is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

286.    As described more fully above, Defendants, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Mrs. Buchhorn of her constitutional right to a fair trial by fabricating and perpetuating a knowingly false and nonexistent cause of death; obtained Mrs. Buchhorn's conviction using that false evidence; and failed to correct—and instead repeatedly published—fabricated evidence that they knew to be false when it was used against Mrs. Buchhorn.

287.    Defendants' misconduct resulted directly in the unjust criminal conviction of Mrs. Buchhorn, thereby denying her constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mrs. Buchhorn could not and would not have been pursued.

288.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mrs. Buchhorn's clear innocence. No reasonable coroner or prosecutor from 2017 to present would believe this conduct was lawful.

289.    As a result of Defendants' misconduct as described in this Count, Mrs. Buchhorn suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

290.    The misconduct described in this Count by Mitchell, Valdez, and Seiden was undertaken pursuant to the policy and practice of Douglas County, in the manner more fully described below in Count VI.

291.    Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages.[9] Given the nature of Defendants' conduct—including fabricating evidence to obtain a wrongful conviction of an innocent citizen for a crime that did not even occur—the wisdom of pecuniary punishment is justified and deterring future wrongful convictions is highly advisable.[10] Consequently, Mrs. Buchhorn is entitled to punitive damages.

## COUNT 2
### Conspiracy to Deprive Constitutional Rights by Fabricating and Perpetuating a Knowingly False and Nonexistent Cause of Death in Violation of 42 U.S.C. § 1983

### (BY MRS. BUCHHORN AGAINST MITCHELL, VALDEZ, AND SEIDEN)

292.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

293.    Mrs. Buchhorn is authorized to bring this civil claim against Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

294.    After O.O.'s death, Defendants, acting in concert and with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mrs. Buchhorn for a crime she did not commit (and, indeed, a crime that did not even occur), by fabricating and perpetuating evidence that was used to convict Mrs. Buchhorn and thereby deprive her of her constitutional right to due process, as described above.

---

[9]    *Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992) (cleaned up).
[10]    *Miller v. City of Mission, Kan.*, 705 F.2d 368, 377 (10th Cir. 1983) (cleaned up).

295.    In doing so, Defendants conspired, and had a meeting of the minds, to accomplish an unlawful purpose by an unlawful means. In addition, Defendants agreed among themselves to protect one another from liability for depriving Mrs. Buchhorn of these rights.

296.    In furtherance of their conspiracy, each Defendants committed overt acts and were otherwise willful participants in joint activity.

297.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mrs. Buchhorn's clear innocence.

298.    As a result of Defendants' misconduct described in this Count, Mrs. Buchhorn suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

299.    Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages. Given the nature of Defendants' conduct—including fabricating evidence to obtain a wrongful conviction of an innocent citizen—the wisdom of pecuniary punishment is justified and deterring future wrongful convictions is highly advisable. Consequently, Mrs. Buchhorn is entitled to punitive damages.

### COUNT 3
### *Brady* Violations and Fabricating Evidence in Violation of 42 U.S.C. § 1983

#### (BY MRS. BUCHHORN AGAINST MITCHELL)

300.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

301.    Mrs. Buchhorn is authorized to bring this civil claim against Mitchell pursuant to the civil remedies provision of 42 U.S.C. § 1983.

302.    As described in detail above, Mitchell, under color of law and within the scope of his employment as Douglas County's District Coroner, deprived Mrs. Buchhorn of her constitutional right to a fair trial by withholding and suppressing exculpatory evidence and fabricating evidence against Mrs. Buchhorn.

303.    In the manner described more fully above, Mitchell deliberately withheld exculpatory evidence from Mrs. Buchhorn, among others, thereby misleading and misdirecting the criminal prosecution of Mrs. Buchhorn.

304.    In addition, in the manner described more fully above, Mitchell knowingly fabricated and solicited false evidence implicating Mrs. Buchhorn in a crime that never occurred; obtained Mrs. Buchhorn's conviction using that false evidence; and failed to correct fabricated evidence that he knew to be false when it was used against Mrs. Buchhorn in her criminal trial.

305.    Mitchell also knowingly suppressed and concealed physical evidence that would have exonerated Mrs. Buchhorn.

306.    Further, Mitchell concealed, suppressed, and fabricated other evidence that is not yet known to Mrs. Buchhorn.

307.    Mitchell's misconduct resulted directly in the unjust criminal conviction of Mrs. Buchhorn, thereby denying her constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Mrs. Buchhorn could not and would not have been pursued.

308.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mrs. Buchhorn's clear innocence.

309.    As a result of Mitchell's misconduct described in this Count, Mrs. Buchhorn suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

310.    Mitchell's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages. Given the nature of Mitchell's conduct—including repeated *Brady* violations and fabricating evidence to obtain a wrongful conviction of an innocent citizen—the wisdom of pecuniary punishment is justified and deterring future wrongful convictions is highly advisable. Consequently, Mrs. Buchhorn is entitled to punitive damages.

## COUNT 4
**Malicious Prosecution and Unlawful Pretrial Detention in Violation of 42 U.S.C. § 1983**

### (BY MRS. BUCHHORN AGAINST MITCHELL)

311.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

312.    Mrs. Buchhorn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

313.    In the manner described more fully above, Mitchell, under color of law and within the scope of his employment as Douglas County's District Coroner, deprived Mrs. Buchhorn of her constitutional rights.

314.    Mitchell accused Mrs. Buchhorn of criminal activity—the intentional murder of a nine-month-old baby—and exerted influence to initiate, continue, and perpetuate judicial proceedings against Mrs. Buchhorn without any probable cause for doing so, in violation of her rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

315.    In doing so, Mitchell caused Mrs. Buchhorn to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause that a crime occurred, much less that Mrs. Buchhorn committed that (nonexistent) crime. These judicial proceedings were instituted and continued maliciously, resulting in injury, and all such proceedings were ultimately terminated in Mrs. Buchhorn's favor in a manner indicative of her innocence.

316.    Mitchell subjected Mrs. Buchhorn to unauthorized and arbitrary governmental action that shocks the conscious in that Mrs. Buchhorn was deliberately and intentionally framed for a crime of which she was totally innocent (and that, in fact, never even occurred), through Mitchell's fabrication, suppression, and withholding of evidence.

317.    Mrs. Buchhorn lacks an adequate state law remedy to redress Mitchell's misconduct, as described in this Count.

318.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mrs. Buchhorn's clear innocence.

319.    As a result of Mitchell's misconduct described in this Count, Mrs. Buchhorn suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

320.    Mitchell's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages. Given the nature of Mitchell's conduct—including fabricating evidence to obtain a wrongful conviction of an innocent citizen—the wisdom of pecuniary punishment is justified and deterring future wrongful convictions is highly advisable. Consequently, Mrs. Buchhorn is entitled to punitive damages.

## COUNT 5

## Conspiracy to Deprive Constitutional Rights in Violation of 42 U.S.C. § 1983

### (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS)

321.    The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

322.    Plaintiffs are authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

323.    After O.O.'s death, Defendants, acting in concert and with other co-conspirators, known and unknown, reached an agreement among themselves to frame Mrs. Buchhorn for a crime she did not commit (and, indeed, a crime that did not even occur) and deprive her of her constitutional rights by maliciously causing Mrs. Buchhorn's prosecution, by fabricating and perpetuating evidence that would be used to convict Mrs. Buchhorn and continue to hold her in jeopardy, by withholding exculpatory information from Mrs. Buchhorn's defense, and by continuing to publicly declare that Mrs. Buchhorn murdered O.O. after criminal charges were dismissed.

324.    Simultaneously, Mrs. Buchhorn, pursuant to the First Amendment, has a fundamental liberty interest, as a parent, in the care, custody, control, and association of her children and in the association with her husband. This interest is implied to these Defendants through the Fourteenth Amendment. These Defendants deprived Mrs. Buchhorn of her liberty interest in the care, custody, control, and association of her children and association with her husband by unlawfully detaining her; unlawfully removing her from her home; and falsely convicting her of a crime she did not commit.

325.     In doing so, Defendants conspired to accomplish an unlawful purpose by an unlawful means. In addition, Defendants agreed among themselves to protect one another from liability for depriving Mrs. Buchhorn of these rights.

326.     In furtherance of their conspiracy, each Defendant committed overt acts and where otherwise willful participants in joint activity, including the Municipality Defendants' intentional failure to adequately screen.

327.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mrs. Buchhorn's clear innocence.

328.     As a result of Defendants' misconduct described in this Count, Plaintiffs suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

329.     Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages. Given the nature of Defendants' conduct—including fabricating evidence to obtain a wrongful conviction of an innocent citizen—the wisdom of pecuniary punishment is justified and deterring future wrongful convictions is highly advisable. Consequently, Plaintiffs are entitled to punitive damages.

## COUNT 6
## Municipal Liability for Violations of 42 U.S.C. § 1983

### (BY ALL PLAINTIFFS AGAINST DOUGLAS COUNTY AND EUDORA)

330.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

331.     Plaintiffs are authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

332.    As described more fully herein, Defendant Board of County Commissioners for the County of Douglas County, Kansas and Defendant City of Eudora, Kansas are themselves liable for the violation of Plaintiffs' constitutional rights.

333.    Douglas County was, at all times relevant to this Complaint, responsible for the Sheriff's Office, DA's Office, Coroner's Office, Mitchell, Valdez, and Seiden.

334.    Eudora was, at all times relevant to this Complaint, responsible for the Eudora PD.

335.    These Defendants, by and through their final policymakers, had in force and effect from 2017 to present a policy, practice, or custom of unconstitutional misconduct, including, in particular, informal policies, procedures, and customs that created a widespread practice of government officials abusing their government authority (including wrongfully convicting innocent citizens, fabricating evidence, and suppressing relevant evidence; unlawfully seizing and ultimately stealing private property; and discouraging, preventing, and failing to investigate complaints of misconduct).

336.    These Defendants, by and through their final policymakers, had in force and effect from 2017 to present a policy, practice, or custom of failing to adequately screen, evaluate, supervise, discipline, and train its employees.

337.    These Defendants, by and through their final policymakers, had in force and effect from 2017 to present a policy, practice, or custom of encouraging further wrongful convictions, including ratification of unconstitutional conduct and fostering a culture of wrongfully convicting innocent citizens.

338.    These Defendants, by and through their final policymakers, had in force and effect from 2017 to present a policy, practice, or custom of unlawfully seizing and ultimately stealing

private property, including ratification of unconstitutional conduct and fostering a culture of such unconstitutional government theft.

339.    These Defendants, by and through their final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges of its employees' misconduct, as described in greater detail above.

340.    These Defendants, by and through their final policymakers, had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into, charges that widespread failures to supervise or discipline its employees for misconduct enabled such employees to engage in misconduct without repercussion.

341.    The continued adherence to these unconstitutional municipal customs, practices, and/or policies amounted to deliberate indifference to the constitutional rights of citizens like Mrs. Buchhorn.

342.    Despite repeated opportunities to do so and for years beforehand, these Defendants, by and through their final policymakers, failed to adequately supervise, discipline, and train its employees to use proper and legal investigative tactics by not fabricating and perpetuating evidence, fabricating the existence of crimes, failing to turn over exculpatory evidence to the prosecution and criminal defendants, wrongly seizing and ultimately stealing private property, and wrongfully pursuing, prosecuting, or convicting innocent individuals to close cases.

343.    These Defendants deliberately ignored the egregious acts of their employees, despite multiple employees and final policymakers knowing about the misconduct but either encouraging or turning a blind eye to it.

344.     These Defendants, by and through their final policymakers, knew that failing to act would be substantially certain to result in constitutional violations including, but not limited to, Mrs. Buchhorn's wrongful conviction.

345.     Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mrs. Buchhorn's wrongful conviction and the theft of her private property, as well as all of the other grievous injuries and damages set forth above.

## COUNT 7
## Interference with Family Relationships in Violation of 42 U.S.C. § 1983

### (BY ALL PLAINTIFFS AND AGAINST MITCHELL)

346.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

347.     Plaintiffs are authorized to bring this civil claim against Mitchell pursuant to the civil remedies provision of 42 U.S.C. § 1983.

348.     Mitchell fabricated evidence to falsely convict Mrs. Buchhorn for a crime that did not occur.

349.     Plaintiffs enjoyed a close relationship and relied on each other for mutual support.

350.     Without Mitchell's unlawful actions, Mrs. Buchhorn would not have been falsely convicted of murdering O.O.

351.     Mitchell intentionally deprived Plaintiffs of their right of familial association with each other.

352.     As a result of Mitchell's unlawful and intentional actions, Mrs. Buchhorn was falsely convicted and imprisoned. Mitchell caused Mrs. Buchhorn to be wrongfully detained and arrested, caused her wrongful incarceration by fabricating evidence, committing perjury, and

suppressing exculpatory evidence (and at the same time knowing that no crime occurred and Mrs. Buchhorn was innocent).

353.    Mitchell denied Plaintiffs their relationship with each other while Mrs. Buchhorn was imprisoned for over 2,000 days.

354.    Mitchell's conduct as described herein deliberately violated Plaintiffs' clearly established First Amendment and Fourteenth Amendment rights to be free from unwarranted government interference with their familial relationships without due process of law.

355.    Mitchell performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Plaintiffs' clearly established constitutional rights. No reasonable coroner in 2017 would believe this conduct was lawful.

356.    Mitchell's acts were the direct and proximate cause of Plaintiffs' injuries, and Mitchell knew, or was deliberately indifferent, that his conduct would result in injuries and damages to Plaintiffs.

357.    Mitchell's acts were motivated by an evil motive or intent, or involved reckless or callous indifference to Plaintiffs' federally protected rights. Mitchell's conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages. Given the nature of Mitchell's conduct—including the false conviction of an innocent woman for a crime that never happened—the wisdom of pecuniary punishment is justified and deterring future such conduct by government employees is highly advisable. Consequently, Plaintiffs are entitled to punitive damages.

## COUNT 8
### Seizure, Destruction, and Taking of Property Without Just Compensation in Violation of 42 U.S.C. § 1983

#### (BY MRS. BUCHHORN AND AGAINST DOUGLAS COUNTY, EUDORA, VALDEZ, AND SEIDEN)

358.     The above paragraphs are realleged and incorporated by reference as though fully set forth herein.

359.     Mrs. Buchhorn is authorized to bring this civil claim against these Defendants pursuant to the civil remedies provision of 42 U.S.C. § 1983.

360.     Mrs. Buchhorn has a right to be free from unreasonable seizure of her property or its theft by the government.

361.     These Defendants intentionally seized Mrs. Buchhorn's property, including, but not limited to, her Macbook laptop computer.

362.     These Defendants, or their agents, employees, or contractors, either destroyed, lost, or stole Mrs. Buchhorn's property.

363.     These Defendants have failed to return all of the property they seized from her or otherwise compensate her for such seizure.

364.     These Defendants' conduct as described herein deliberately violated Mrs. Buchhorn's clearly established Fourth Amendment and Fourteenth Amendment rights to be free from unwarranted government search and seizure.

365.     These Defendants performed the above-described acts under color of state law, intentionally, and with reckless disregard and/or deliberate indifference to Mrs. Buchhorn's clearly established constitutional rights. No reasonable government agent in 2017 would believe this conduct was lawful.

366.     These Defendants' acts were the direct and proximate cause of Mrs. Buchhorn's injuries, and these Defendants knew, or were deliberately indifferent, that their conduct would result in injuries and damages to Mrs. Buchhorn.

367.    These Defendants' acts were motivated by an evil motive or intent, or involved reckless or callous indifference to Mrs. Buchhorn's federally protected rights. These Defendants' conduct demands deterrence and punishment beyond that offered by Section 1983's compensatory damages. Given the nature of this conduct—including the theft of Mrs. Buchhorn's personal property—the wisdom of pecuniary punishment is justified and deterring future such conduct by government employees is highly advisable. Consequently, Mrs. Buchhorn is entitled to punitive damages.

## DEMAND FOR JURY TRIAL

368.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand trial to a jury on all issues so triable in this action.

## DESIGNATION OF PLACE OF TRIAL

369.    Pursuant to D. Kan. Rule 40.2, Plaintiffs request Kansas City, Kansas as the place of trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray as follows:

A.    That the Court award compensatory damages to Plaintiffs and against all Defendants, jointly and severally, as will fully and adequately compensate Plaintiffs for the damages they have suffered, in an amount to be determined at trial;

B.    That the Court award punitive damages to Plaintiffs and against all Defendants, jointly and severally, in an amount to be determined at trial, for Defendants' violations of federal law that will deter such conduct by Defendants in the future;

C.    For a trial by jury;

D.    For pre-judgment and post-judgment interest and recovery of Plaintiffs' costs and expenses of litigation, including reasonable attorneys' fees;

E.    Award Plaintiffs injunctive relief requiring Defendants to put in place (and fund) supervision and compliance protocols that actually prevent, uncover, and stop the wrongful convictions of innocent citizens; and

F.    For any and all other relief to which Plaintiffs may be entitled.

Respectfully submitted,

*/s/ William J Skepnek*
William J. Skepnek    KS Bar #10149
THE SKEPNEK LAW FIRM, PA
1 Westwood Rd.
Lawrence, KS 66044
Telephone:    (785) 856-3100
Facsimile:    (785) 856-3099
bskepnek@skepneklaw.com

AND

*/s/ Quentin M. Templeton*
Quentin M. Templeton  KS Bar #26666
FORBES LAW GROUP, LLC
12900 Metcalf Avenue, Suite 210
Overland Park, Kansas 66213
Telephone:    (913) 341-8600
Facsimile:    (913) 341-8606
qtempleton@forbeslawgroup.com

AND

*/s/ Brennan P. Fagan*
Brennan P. Fagan  KS Bar #20430
FAGAN & EMERT, LLC
800 New Hampshire St., Suite 110
Lawrence, Kansas 66044
Telephone:    (785) 331-0300

68

Facsimile:      (785) 331-0303
bfagan@faganemert.com

ATTORNEYS FOR PLAINTIFFS