**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **CARRODY M. BUCHHORN,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF DOUGLAS COUNTY, KANSAS, et al.**<br><br>**Defendants.** | **Case No.: 2:24-CV-02580-KHV** |

# MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT ERIK MITCHELL FOR SUMMARY JUDGMENT

## I. Introduction

This case arises from the investigation and prosecution of Plaintiff Carrody Buchhorn following the death of nine-month-old O.O. in September 2016. Defendant Dr. Erik Mitchell, who was the District Coroner for Douglas County, Kansas at the time, performed O.O.'s autopsy and concluded that the child died from blunt-force trauma. Ms. Buchhorn was subsequently charged with and convicted of second-degree murder. Her conviction was later reversed based on ineffective assistance of counsel, and the criminal charges were ultimately dismissed.

Three claims remain against Dr. Mitchell: withholding exculpatory evidence in violation of *Brady* (Count III), malicious prosecution (Count IV), and conspiracy to deprive Plaintiffs of their constitutional rights under the First and Fourteenth Amendments (Count V).[1] The undisputed evidence does not support liability on any of these claims.

[1] The Court dismissed the remaining claims against Dr. Mitchell, including the fabrication of evidence claims and the separate familial-association claim. (ECF 81, 87).

Dr. Mitchell performed the autopsy, documented his findings, and obtained supplemental reports from medical professionals and laboratories. Those reports included the Heart Pathology Report and laboratory findings that Plaintiffs now characterize as exculpatory. Rather than conceal those findings, Dr. Mitchell included them in their entirety into the autopsy report. He filed the autopsy report with the Clerk of the Douglas County District Court in accordance with Kansas law and separately provided it, along with his complete file, to prosecutors long before Ms. Buchhorn's criminal trial. The prosecutors therefore had the very information Plaintiffs contend is exculpatory. He never instructed prosecutors to withhold any information. He did not identify Ms. Buchhorn as the person responsible for O.O.'s death or decide whether charges should be filed. He did not determine what evidence prosecutors would disclose to the defense and was never informed what materials prosecutors ultimately provided to Ms. Buchhorn's defense counsel.

Plaintiffs dispute Dr. Mitchell's cause-of-death determination and contend that the medical findings support a different conclusion. However, a disagreement over the interpretation of forensic evidence does not establish that Dr. Mitchell knowingly or recklessly fabricated evidence or suppressed information. Nor is there evidence from which a reasonable jury could find that he acted maliciously, conspired with anyone, or otherwise caused Ms. Buchhorn's prosecution through unconstitutional conduct.

The question is not whether Dr. Mitchell's forensic conclusions were correct, but whether his conduct violated clearly established law. Because the undisputed evidence does not support such a violation, Dr. Mitchell is entitled to qualified immunity and summary judgment on Plaintiffs' claims.

## II. Statement of Uncontroverted Facts

1. Plaintiffs Carrody Buchhorn and Timothy Buchhorn are married. Plaintiffs Gregory Snell and Matthew Buchhorn are Carrody Buchhorn's biological children. (ECF 178).

2. Defendant Douglas County, Kansas, is a political subdivision of the State of Kansas. (ECF 178, at 2).

3. Defendant Dr. Erik Mitchell is a board-certified forensic pathologist who was appointed District Coroner for Douglas County, Kansas, in 1996 pursuant to K.S.A. § 22a-226(a). (ECF 178; **Exhibit A**, Mitchell Decl. at ¶ 2)

4. As District Coroner, Dr. Mitchell's statutory responsibilities included investigating certain deaths and performing autopsies when required by Kansas law, including deaths involving children under circumstances specified by statute. (**Exhibit A,** Mitchell Decl. at ¶ 3; K.S.A. § 22a-242).

5. Dr. Mitchell was reappointed as District Coroner for Douglas County, Kansas to serve for a four-year term pursuant to K.S.A. § 22a-226 in 2001, 2003, 2007, 2011, 2013, and 2017. (ECF 178, at 2).

6. Dr. Mitchell resigned his appointment as District Coroner for Douglas County effective April 30, 2018. (ECF 178, at 2).

7. In 2016, Plaintiff Carrody Buchhorn worked at an in-home daycare in Eudora, Kansas. (ECF 178, at 2).

8. On September 29, 2016, Carrody Buchhorn found 9-month old O.O. unresponsive after an afternoon nap. (ECF 178, at 3).

9. Carrody Buchhorn attempted CPR until paramedics arrived, but efforts to save O.O. were unsuccessful and he died. (ECF 178, at 3).

10. Dr. Mitchell performed the autopsy on O.O. (**Exhibit B,** Mitchell Dep., 96:17-22, 108:18-24, 111:18-21, 247:23-25, 248:1-15, 249:20-250:3, Ex. 98).

11. Before performing the autopsy on September 30, 2016, Dr. Mitchell accompanied O.O.'s body to Midwest Transplant Network, where he removed O.O.'s heart under sterile conditions to permit the donation of heart valves and performed an examination of the heart. (**Exhibit A,** Mitchell Decl. at ¶ 4; **Exhibit C,** MTN00011;).

12. During his examination of the heart, Dr. Mitchell did not identify an opening in the fossa ovalis. He documented his observations concerning O.O.'s heart in the autopsy report. (**Exhibit D,** Coroner's Report at 11, **Exhibit A,** Mitchell Decl. at ¶ 5).

13. After removing and examining O.O.'s heart, O.O.'s body was transferred to the morgue in Kansas City, where Dr. Mitchell performed the autopsy. (**Exhibit A,** Mitchell Decl. at ¶ 6)

14. The autopsy documented numerous physical findings, including hemorrhage along the right carotid sheath, a contusion of the thymus, hemorrhage in the soft tissues anterior to the abdominal vertebral column, a tear of the deep surface of the liver, and approximately 200-300 cc of blood within the abdominal cavity (hemoperitoneum). (**Exhibit D,** Coroner's Report at 5-12).

15. The autopsy also revealed an occipital skull fracture extending from the right side of the foramen magnum through the occiput and into the posterior aspect of the middle cranial fossa. (**Exhibit D,** Coroner's Report at 8).

16. The autopsy documented areas of hemorrhage involving O.O.'s scalp, including an area measuring approximately 4 by 2 inches in the left frontal region and another area of hemorrhage overlying the occipital skull fracture. (**Exhibit D,** Coroner's Report at 7-8).

17. O.O.'s heart was subsequently examined by Dr. Shannon Mackey-Bojack, a cardiac pathologist associated with the Jesse E. Edwards Registry of Cardiovascular Disease in St. Paul, Minnesota. The results of that examination were documented and signed by Mackey-Bojack on October 6, 2016. (**Exhibit A,** Mitchell Decl. at ¶ 7; **Exhibit D,** Coroner's Report, at 19-21) Those results will sometimes hereinafter be referred to as the "Heart Pathology Report."

18. The Heart Pathology Report identified a patent foramen ovale ("PFO") in O.O.'s heart. (**Exhibit D,** Coroner's Report, at 19-21).

19. The Heart Pathology Report noted that the microscopic examination of O.O.'s heart identified a focal area in the anterior wall of the left ventricle consisting of hypereosinophilic myocytes with contraction bands and no associated interstitial inflammatory infiltrate. (**Exhibit D,** Coroner's Report, at 19-21).

20. LabCorp performed laboratory testing on specimens obtained during the autopsy. Blood cultures were positive for Streptococcus salivarius, while viral cultures were positive for rhinovirus and enterovirus. (**Exhibit A,** Mitchell Decl. at ¶ 8; **Exhibit D,** Coroner's Report at 12-16).

21. NMS Labs performed toxicological testing on O.O.'s blood and issued its report on October 14, 2016. The examination did not identify findings of toxicological significance. (**Exhibit A,** Mitchell Decl. at ¶ 9; **Exhibit D,** Coroner's Report at 12, 17-18).

22. Dr. Mitchell received the Heart Pathology Report and the reports from LabCorp and NMS Labs. Dr. Mitchell reviewed and considered those findings before finalizing his autopsy report and his determination concerning O.O.'s cause and manner of death. (**Exhibit B,** Mitchell Dep. 283:14-285:14; **Exhibit A,** Mitchell Decl. at ¶ 10).

23. Dr. Mitchell incorporated the Heart Pathology Report and the reports from LabCorp and NMS Labs into his autopsy report. The LabCorp findings appeared in the section of the autopsy report titled "Laboratory Examination," at pages 8-12 as marked in the lower right-hand corner of the document; the NMS Labs findings appeared in the section titled "Toxicologic Examination," at pages 13-14; and the Heart Pathology Report appeared in the section titled "Cardiac Consultation," at pages 15-17. (**Exhibit A,** Mitchell Decl. at ¶ 11; **Exhibit D,** Coroner's Report at 12-21).

24. Dr. Mitchell finalized and signed the autopsy report on January 13, 2017. The autopsy report that Dr. Mitchell signed on January 13, 2017 spans 19 pages. (**Exhibit D,** Coroner's Report at 5-23; **Exhibit B,** Mitchell Dep. 283:14-285:14; **Exhibit A,** Mitchell Decl. at ¶ 12).

25. On December 13, 2017, Dr. Mitchell supplemented his autopsy report with an addendum documenting additional microscopic findings from slides that were prepared. (**Exhibit D,** Coroner's Report at 24; **Exhibit B,** Mitchell Dep. 283:14-285:14; **Exhibit A,** Mitchell Decl. at ¶ 13).

26. The pages of the autopsy report bear the date September 30, 2016 in the header. That date identifies the date the autopsy was performed, not when the report is finalized. The autopsy report is not finalized until it is signed by Dr. Mitchell. (**Exhibit D,** Coroner's Report at 5-23; **Exhibit A,** Mitchell Decl. at ¶ 14).

27. Dr. Mitchell ultimately determined that O.O. died as a consequence of blunt-force trauma and classified the manner of death as homicide. (**Exhibit A,** Mitchell Decl. at ¶ 15; **Exhibit D,** Coroner's Report at 5).

28. Dr. Mitchell's findings and conclusions concerning O.O.'s cause of death represented his professional judgment based on the information available to him. All of that

information was contained in his file and provided to the Douglas County District Attorney's Office before Ms. Buchhorn's criminal trial. (**Exhibit A,** Mitchell Decl. at ¶ 16)

29. Dr. Mitchell did not change the description of his own examination of the heart to state that the heart contained a PFO because he did not observe a PFO. Instead, he included the Heart Pathology Report in the autopsy report so that the report contained both his findings and Dr. Mackey-Bojack's findings. (**Exhibit A,** Mitchell Decl. at ¶ 17; **Exhibit D,** Coroner's Report at 11, 19-21).

30. Dr. Mitchell did not alter or remove any findings from the Heart Pathology Report or reports from LabCorp or NMS Labs before incorporating them into his autopsy report. (Mitchell Decl. at ¶ 18).

31. On January 17, 2017, the coroner's report concerning O.O.'s death was filed with the Clerk of the Douglas County District Court. (**Exhibit B,** Mitchell Dep., 247:23-25, 248:1-15, 249:20-250:3, Ex. 98)

32. The coroner's report consists of several components, including a report of death, information provided by law enforcement, and the autopsy report. (**Exhibit B,** Mitchell Dep., 247:23-25, 248:1-15, 249:20-250:3, Ex. 98).

33. Pursuant to K.S.A. § 22a-232(b), Dr. Mitchell designated the coroner's report as confidential and directed the clerk that it be filed under seal. (**Exhibit B,** Mitchell Dep., 247:23-25, 248:1-15, 249:20- 250:3, Ex. 98 at 1).

34. On April 17, 2017, Senior Assistant District Attorney for Douglas County CJ. Rieg emailed Dr. Mitchell's office requesting the entire file concerning O.O.'s death in preparation for trial. (**Exhibit A,** Mitchell Decl. at ¶ 19).

35. On April 20, 2017, Dr. Mitchell's office mailed a disc containing his file concerning O.O.'s death to Rieg, which included the signed autopsy report containing Dr. Mitchell's autopsy findings as well as the findings set forth in the Heart Pathology Report, LabCorp reports, and NMS Labs report. (**Exhibit A,** Mitchell Decl. at ¶ 19-20)

36. On September 1, 2017, Dr. Mitchell provided Charles Branson, then Douglas County District Attorney, with two copies of his complete file concerning O.O. Included in those files were, among other documents, the signed autopsy report containing Dr. Mitchell's autopsy findings as well as the findings set forth in the Heart Pathology, LabCorp reports, and NMS Labs report. (**Exhibit A,** Mitchell Decl. at ¶ 21-22).

37. The Douglas County District Attorney's files for Ms. Buchhorn's criminal case contain Dr. Mitchell's September 1, 2017 letter to District Attorney Charles Branson stating that he enclosed copies of his investigative file, as well as three discs containing copies of Dr. Mitchell's signed autopsy report. Each copy of the autopsy report contains the LabCorp reports, the. NMS Labs report, and the Heart Pathology Report. (**Exhibit E,** Loomis Decl.)

38. Dr. Mitchell never instructed the Douglas County District Attorney's Office to withhold the Heart Pathology Report, the laboratory results, or any other materials from Ms. Buchhorn or her criminal defense attorneys. He did not determine what evidence prosecutors would disclose to Ms. Buchhorn's criminal defense counsel and was never informed what materials prosecutors ultimately provided to Ms. Buchhorn's defense counsel. (**Exhibit A,** Mitchell Decl. at ¶ 23).

39. Dr. Turner did not perform an autopsy of O.O. Rather, she reviewed materials provided by Douglas County District Attorney Suzanne Valdez, including Dr. Mackey-Bojack's

Heart Pathology Report, LabCorp reports, and NMS Labs report. (**Exhibit F,** Turner Dep. 8:16-23; 40:13-18, 75:1-4, 79:1-12, 82:1-22; 91:18-94:19, Ex. 2 at 1-2).

40. On April 14, 2017, Douglas County District Attorney's Office filed criminal charges against Buchhorn arising from O.O.'s death. (**Exhibit G,** C. Buchhorn Dep., 22:15-19; **Exhibit H).**

41. Dr. Mitchell did not make the decision to file criminal charges against Ms. Buchhorn, did not recommend that Buchhorn be charged, did not identify Ms. Buchhorn as the person who inflicted O.O.'s injuries, nor did Dr. Mitchell have authority to determine whether the criminal charges against Ms. Buchhorn would be filed, dismissed, or pursued. (**Exhibit A,** Mitchell Decl. at ¶ 24)

42. On July 26, 2018, the jury found Carrody Buchhorn guilty of second-degree murder. (ECF 178).

43. On August 13, 2021, the Kansas Court of Appeals reversed Carrody Buchhorn's conviction on the basis that Carrody Buchhorn had been afforded ineffective assistance of counsel. (ECF 178, Stipulated Fact #11; *State v. Buchhorn*, 492 P.3d 507 (Kan. Ct. App. 2021)).

44. The Kansas Supreme Court affirmed the decision of the Kansas Court of Appeals on August 19, 2022. (ECF 178, at 3; *State v. Buchhorn*, 316 Kan. 324, 515 P.3d 282 (2022)).

45. Following remand, the Douglas County District Attorney's Office reconsidered its prosecution of Ms. Buchhorn. On October 5, 2022, the District Attorney announced that the State had abandoned Dr. Mitchell and his cause-of-death theory. (ECF 178, at 7).

46. On November 1, 2022, following the State's abandonment of Dr. Mitchell, the Douglas County District Court set a deadline for the State to disclose the new expert and the expert's report by December 16, 2022. (**Exhibit I**).

47. On December 16, 2022, the Douglas County District Court denied the State's request for a continuance of the expert deadline, dismissed the criminal case against Carrody Buchhorn, and ordered her released from custody. (ECF 178; **Exhibit I**).

48. Following the reversal of Ms. Buchhorn's conviction, Dr. Mitchell did not participate in decisions concerning whether to seek further appellate review, retry Ms. Buchhorn, continue pursuing criminal charges, or retain additional expert witnesses. (**Exhibit A,** Mitchell Decl. at ¶ 25)

49. Following the dismissal of criminal charges, Dr. Mitchell did not publicly declare Ms. Buchhorn guilty of O.O.'s death or enter into an agreement with anyone to publicly declare Ms. Buchhorn guilty of O.O.'s death. (**Exhibit A,** Mitchell Decl. at ¶ 26)

50. Dr. Mitchell did not know Plaintiffs before O.O.'s death, had no preexisting personal relationship with them, and had no personal animus against them. (**Exhibit A,** Mitchell Decl. at ¶ 27)

51. Before Ms. Buchhorn's criminal trial, her defense attorney, Paul Morrison, was aware of the controversy surrounding Dr. Mitchell's departure from the medical examiner's office in New York. Morrison testified in a posttrial hearing that he heard allegations concerning the circumstances of Dr. Mitchell's departure and had personally discussed the matter with Dr. Mitchell. Morrison further testified that he decided not to use the New York controversy to challenge Dr. Mitchell's credibility at trial because he did not believe doing so would be productive. Morrison's co-counsel, Angela Dersch, likewise testified that she was aware of the controversy and was asked about the 2015 *Rivas* case from the Second Circuit. (**Exhibit J**).

## III. Issues Presented

**A. Whether Dr. Mitchell is entitled to absolute immunity from liability to the extent Plaintiffs' claims arise from his testimony during Ms. Buchhorn's criminal proceedings?**

**B. Whether Dr. Mitchell is entitled to summary judgment on Plaintiffs' *Brady* claim where the undisputed evidence establishes that he incorporated the purported exculpatory evidence into his autopsy report and provided those materials to prosecutors, Plaintiffs cannot establish a violation of clearly established law, and the claim is time-barred?**

**C. Whether Dr. Mitchell is entitled to summary judgment on Plaintiffs' malicious prosecution claim where the record does not establish that he knowingly fabricated evidence, suppressed material information, caused Ms. Buchhorn's prosecution or continued confinement without probable cause, acted with malice, and the claim is time-barred?**

**D. Whether Dr. Mitchell is entitled to summary judgment on Plaintiffs' conspiracy claim where the record does not establish an agreement to violate Plaintiffs' constitutional rights, concerted action toward an unlawful objective, or an underlying constitutional deprivation, and the claim is time-barred?**

## IV. Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates there is "no genuine dispute as to any material fact" and that the movant is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). This standard dictates that the court "view the evidence and make inferences in the light most favorable to the non-movant." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party on the issue." *Id.* (internal quotations omitted). "An issue of fact is material if under the substantive law it is essential to the proper disposition of the claim or defense." *Id.* at 1283.

The moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."

*Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010). To meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim." *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Kannady*, 590 F.3d at 1169; *see also Celotex Corp. v. Caltrett*, 477 U.S. 317, 324 (1986). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

Finally, federal courts do not view summary judgment as a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327. Instead, it represents an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Id.* (quoting Fed. R. Civ. P. 1).

## V. Argument

### A. Dr. Mitchell is entitled to absolute immunity for his testimony during the criminal proceedings

To the extent Plaintiffs seek to impose liability on Dr. Mitchell based on his testimony during judicial proceedings, those claims are barred by absolute witness immunity. In *Briscoe v. LaHue*, 460 U.S. 325, 326 (1983), the Supreme Court held that witnesses are absolutely immune from liability under § 1983 for their testimony in judicial proceedings, even when the testimony is alleged to be knowingly false. This Court has already applied that principle to Dr. Mitchell's testimony. (ECF 81, at 27). Plaintiffs nevertheless continue to identify Dr. Mitchell's testimony as a basis for their remaining claims. (ECF 178). To the extent the claims are based on Dr. Mitchell's

testimony during the judicial proceedings, Dr. Mitchell is entitled to absolute immunity, and therefore to judgment as a matter of law on each of Plaintiffs' claims to the extent they are based on his testimony.

**B. Dr. Mitchell is entitled to qualified immunity on Plaintiffs' claims**

Government officials sued in their individual capacity are entitled to qualified immunity from suit and liability for civil damages for performing discretionary functions so long as their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Supreme Court has set forth a two-step inquiry for resolving qualified immunity claims. *Id.* at 232. First, plaintiffs must establish that Dr. Mitchell violated a constitutional right. *See id.* Second, the Court must determine whether the right at issue was clearly established at the time of Dr. Mitchell's conduct. *See id.*

A right is clearly established if Supreme Court or Tenth Circuit precedent (or the weight of authority from other circuits) would put reasonable officers in the defendants' position on notice they were violating the constitution. *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1210 (10th Cir. 2017). The law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). This does not require the existence of a case exactly on point. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). However, it does require that the existing caselaw be sufficiently clear to place the constitutional issue "beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, Dr. Mitchell is entitled to qualified immunity on each of Plaintiffs' claims. As discussed below, the undisputed evidence establishes that Dr. Mitchell did not violate Plaintiffs' constitutional rights by suppressing exculpatory evidence, maliciously causing Ms. Buchhorn's prosecution without probable cause, or conspiring to deprive Plaintiffs of their constitutional right. Even if Plaintiffs could establish a genuine dispute of material fact concerning a constitutional violation, the conduct did not violate clearly established law. Accordingly, Dr. Mitchell is entitled to summary judgment.

**1. *Brady* Claim**

Plaintiffs allege Dr. Mitchell violated Ms. Buchhorn's constitutional right to a fair trial by withholding and suppressing exculpatory evidence. Specifically, Plaintiffs identify four categories of alleged misconduct: (1) withholding and suppressing historical allegations of misconduct that could have been used to impeach Dr. Mitchell's credibility; (2) withholding and suppressing Dr. Mackey-Bojack's Heart Pathology Report showing a patent foramen ovale and ischemic damage and lab results showing infection, and filing the autopsy report containing those findings under seal; (3) testifying that O.O.'s heart was normal and provided no evidence of a cause of death; and (4) failing to take necessary x-rays, collect various fluids and tissue samples, and look for exonerating evidence within O.O., thereby destroying such evidence. (ECF 178). The undisputed record establishes that Dr. Mitchell did not violate Plaintiffs' constitutional rights.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." 373 U.S. at 87. To establish a *Brady* violation, a plaintiff must show that "(1) the prosecution suppressed evidence, (2) the evidence

was favorable to the defendant, and (3) the evidence was material." *Johnson v. City of Cheyenne*, 99 F.4th 1206, 1226 (10th Cir. 2024) (internal quotation omitted).

The Tenth Circuit has extended the disclosure obligation beyond the individual prosecutor to law enforcement and investigative personnel in the police department who are actively involved in the criminal investigation. *Tiscarano v. Anderson*, 639 F.3d 1016, 1022 (10th Cir. 2011) (citing *Pierce v. Gilchrist*, 359 F.3d 1279, 1281 (10th Cir. 2004)). Here, Dr. Mitchell is entitled to qualified immunity because the undisputed record does not establish that his conduct violated clearly established law.

**a. Dr. Mitchell did not suppress the Heart Pathology Report or laboratory results**

Plaintiffs contend that Dr. Mitchell concealed evidence inconsistent with his determination that O.O. died from blunt force trauma. They identify Dr. Mackey-Bojack's cardiac pathology findings, including a patent foramen ovale, as well as laboratory results reflecting the presence of an infection. Plaintiffs contend that Dr. Mitchell concealed these findings by filing his autopsy report under seal. The undisputed record establishes otherwise.

Dr. Mitchell's autopsy report identified blunt force trauma as the cause of death. In reaching that conclusion, Dr. Mitchell documented his anatomical findings, including the occipital skull fracture, scalp hemorrhages, and injuries to the torso and abdominal organs. Following the autopsy, Dr. Mitchell obtained supplemental reports, including the Heart Pathology and laboratory testing results. Rather than excluding findings that Plaintiffs now characterize as exculpatory, Dr. Mitchell incorporated them directly into the autopsy report.

The significance of those findings is disputed. Plaintiffs contend that they support a natural cause of death. Dr. Mitchell disagrees. But that disagreement does not establish a *Brady* violation. Dr. Mitchell's findings and the supplemental findings that Plaintiffs allege are exculpatory were

included in the autopsy report that was signed by Dr. Mitchell on January 13, 2017, and filed with the Clerk of the Douglas County District Court on January 17, 2017. Dr. Mitchell complied with the statutory requirements governing the preparation and filing of coroner reports in Kansas. K.S.A. § 22a-232(a) requires a coroner to investigate the cause of death, reduce the findings to a written report, and file that report with the clerk of the district court. Similarly, K.S.A. § 22a-233(d) requires that a complete record of the facts developed during an autopsy and the pathologist's findings be prepared and filed with both the coroner and the district court clerk. These provisions establish the statutory procedure by which Kansas coroners document and file their findings. Dr. Mitchell followed that procedure, which included filing the reports Plaintiffs now contend were exculpatory.

The fact that the autopsy report was filed under seal does not change the analysis. K.S.A. 22a-232(b) expressly authorizes that designation when, in the coroner's opinion, information contained in the report might jeopardize a criminal investigation. Thus, Kansas law specifically contemplates that a coroner may file a report containing information relevant to a criminal investigation while restricting public access to that report. Dr. Mitchell's decision to designate the report as confidential does not establish a *Brady* violation. Although the statutory designation restricts public access, it does not establish that the report was withheld from the prosecution or Ms. Buchhorn. *See State v. Bodine*, 313 Kan. 378, 402-03 (2021) (documents filed under seal do not prevent the parties or the court from accessing them); K.S.A. § 22a-235 (providing that "[t]he records of the coroner filed with the clerk of the district court . . . *shall* be received in any court . . . as competent evidence.") (emphasis added). Kansas law does not provide that designating a coroner report as confidential document filing it under seal renders it inadmissible or unavailable to the parties in a criminal prosecution stemming from the death contained in the report.

More importantly, Dr. Mitchell did more than file the autopsy report with the district court clerk. He separately provided his investigative materials to the Douglas County District Attorney's Office on multiple occasions prior to Ms. Buchhorn's criminal trial. On April 17, 2017, Assistant District Attorney C.J. Rieg requested Dr. Mitchell's complete investigative file, and Dr. Mitchell's office responded on April 20, 2017, by transmitting the requested materials, which included the Mackey-Bojack report and laboratory reports. In September 2017, Dr. Mitchell provided the District Attorney's Office with two additional copies of his complete file. The Douglas County District Attorney's Office confirmed that it possessed multiple copies of the evidence Plaintiffs now characterize as exculpatory.

The record establishes more than Dr. Mitchell's compliance with Kansas statutes governing coroner reports. It establishes that Dr. Mitchell affirmatively provided the prosecution with the underlying findings that Plaintiffs now characterize as exculpatory. The record contains no evidence that Dr. Mitchell withheld those findings from prosecutors, altered the Mackey-Bojack or laboratory reports, provided an incomplete investigative file, or directed anyone to conceal the information from Ms. Buchhorn.

This case is materially distinguishable from *Pierce v. Gilchrist*, 359 F.3d 1279 (10th Cir. 2004). There, a chemist who was employed by the police department allegedly concealed exculpatory test results and affirmatively misrepresented forensic findings, thereby depriving prosecutors of information necessary to evaluate the evidence. Conversely, here, Dr. Mitchell included the alleged exculpatory findings in his report and provided the information to prosecutors. The fact that Dr. Mitchell did not consider the Heart Pathology Report and laboratory findings sufficient to change his cause-of-death determination does not establish that he suppressed them. *Brady* does not require a coroner to adopt the interpretation of another medical professional merely

because the findings may be capable of supporting an alternative conclusion. Plaintiffs may dispute Dr. Mitchell's interpretation of the cardiac pathology and laboratory results, but they cannot establish that he concealed those results from the prosecution.

To the extent Plaintiffs contend that the prosecution subsequently failed to disclose the cardiac pathology report or laboratory results to Ms. Buchhorn's criminal defense attorneys, that contention does not establish that Dr. Mitchell suppressed the evidence. The prosecutors possessed the materials and were responsible for evaluating their significance and determining what disclosures were constitutionally required. *See Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995) (explaining that prosecutors bear responsibility for evaluating the cumulative significance of potentially favorable evidence and making the disclosures required by *Brady*); *Tiscareno*, 639 F.3d at 1022-23 (distinguishing an investigator's obligation not to knowingly or recklessly withhold exculpatory information from the prosecutor's disclosure obligations). There is no evidence that Dr. Mitchell directed prosecutors to withhold the reports, misrepresented their contents, or otherwise interfered with their disclosure. Accordingly, the undisputed evidence establishes that Dr. Mitchell did not suppress material exculpatory evidence in violation of *Brady*.

Even assuming Plaintiffs could establish that Dr. Mitchell's compliance with Kansas law and subsequent disclosures to prosecutors were constitutionally insufficient, they cannot establish that Dr. Mitchell violated clearly established law. There is no controlling case law establishing that a district coroner who documents his underlying autopsy findings, incorporates supplemental findings into his autopsy report, files that report in accordance with state law, and provides his complete file to prosecutors must take additional steps to ensure the materials are disclosed to the criminal defense. *See Lyman v. Bd. of Cnty. Comm'rs of Geary Cnty.*, No. 25-2023-EFM, 2025 WL 2855388, at *12 (D. Kan. Oct. 8, 2025) (coroner entitled to qualified immunity on *Brady* claim

arising from his alleged failure to disclose exculpatory information to criminal defense counsel after communicating it to the lead detective). Nor is there case law clearly establishing that a coroner violates *Brady* merely by utilizing the statutory procedure for designating an autopsy report as a confidential criminal investigation record, particularly when the prosecutor actually possesses the report. Accordingly, even if Plaintiffs could establish some constitutional violation in Dr. Mitchell's conduct, they cannot establish that his actions violated clearly established law. Therefore, Dr. Mitchell is entitled to qualified immunity.

**b. Dr. Mitchell did not suppress impeachment evidence**

Plaintiffs also contend that Dr. Mitchell failed to disclose historical allegations concerning his conduct while employed as a medical examiner in New York, including allegations discussed in *Rivas v. Fischer*, 780 F.3d 529 (2d Cir. 2015). Dr. Mitchell is entitled to judgment as a matter of law on this claim because Plaintiffs cannot establish a genuine dispute of material fact sufficient to overcome Dr. Mitchell's qualified immunity. There is no controlling authority establishing that a district coroner violates the Constitution by not volunteering decades-old allegations concerning his own professional history, particularly where the allegations were, as Plaintiffs allege, widely publicized (ECF 178), and were known to Ms. Buchhorn's defense counsel. Nor is there evidence that Dr. Mitchell misrepresented his professional history, concealed documents in his possession, refused to answer inquiries concerning his prior employment, or otherwise prevented the prosecution or Ms. Buchhorn from obtaining the information.

Moreover, the Tenth Circuit has recognized that the government's failure to disclose evidence does not violate Brady when the defendant already knew or and had access to the information. *See United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009). Ms. Buchhorn's

criminal defense counsel knew of the underlying allegations stemming from Dr. Mitchell's employment in New York and elected not to pursue it at trial.

Accordingly, Plaintiffs cannot establish, as a matter of law, that Dr. Mitchell suppressed material impeachment evidence in violation of *Brady*. Even if Plaintiffs' could demonstrate a genuine dispute as to a material fact regarding a *Brady* violation, Dr. Mitchell would still be entitled to summary judgment based on qualified immunity because Plaintiffs cannot identify clearly established law requiring a coroner, under these circumstances, to independently disclose such information.

**c. Dr. Mitchell's alleged failure to conduct additional testing does not establish unconstitutional suppression of exculpatory evidence**

Plaintiffs further allege that Dr. Mitchell failed to obtain necessary x-rays, collect certain fluids and tissue samples, and look for exonerating evidence within O.O., thereby destroying such evidence. (PTO). The record does not establish a *Brady* violation.

*Brady* prohibits the suppression of favorable, material evidence. It does not impose an affirmative constitutional obligation to conduct additional examinations or testing in hope of discovering potentially exculpatory information. *See Arizona v. Youngblood*, 488 U.S. 51, 57-59 (1988). Plaintiffs do not identify existing exculpatory x-rays, laboratory results, or tissue analyses that Dr. Mitchell obtained and subsequently concealed. Rather, their theory depends on speculation that additional examinations or testing might have generated evidence supporting an alternative cause of death. But speculation is not enough to survive summary judgment. *See Johnson v. City of Cheyenne*, 99 F.4th 1206, 1229 (10th Cir. 2024) (noting that even if a court could conclude that missing photographs were destroyed or misplaced, it would not assume the missing photographs contained any particular images because doing so "would be to engage in pure speculation and

conjecture, and that we will not do."). Regardless, *Brady* does not impose an obligation to generate potentially exculpatory evidence through additional testing. *See id.* at 57-59. Even if Dr. Mitchell's forensic investigation had been incomplete or negligent, that does not establish a constitutional violation. *See Youngblood*, 488 U.S. at 57-59.

Even assuming Plaintiffs could establish a constitutional violation, Dr. Mitchell would still be entitled to qualified immunity. There is no controlling authority clearly establishing that a district coroner violates due process by failing to perform additional examinations or collect the additional specimens at issue here. Accordingly, Dr. Mitchell is entitled to qualified immunity on this theory.

**d. Plaintiffs' *Brady claim* is time-barred.**

Kansas two-year statute of limitations applies to claims under § 1983. Ordinarily, a § 1983 claim accrues when the plaintiff knows or has reason to know of the injury forming the basis of the claim. *Beck v. City of Muskogee Police Dept.*, 195 F.3d 553, 557 (10th Cir. 1999). When success on the claim would necessarily imply the invalidity of an outstanding criminal conviction, however, accrual may be deferred until the conviction is invalidated. *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994). Under the same *Heck* analysis previously applied by this Court (ECF 81, at 15-18), the claim accrued no later than August 19, 2022, when the Kansas Supreme Court invalidated Ms. Buchhorn's conviction. The same reasoning supports Dr. Mitchell's entitlement to summary judgment on Plaintiffs' *Brady* claim as time-barred.

First, regarding the claim that Dr. Mitchell suppressed the cardiac pathology findings and laboratory findings, those findings were incorporated into Dr. Mitchell's autopsy report that he filed with the Clerk of the Douglas County District Court on January 17, 2017. Kansas law expressly requires coroners to investigate deaths, document their findings, and file their reports.

K.S.A. §§ 22a-232 and 22a-233(d). Thus, the location of Dr. Mitchell's report was established by statute. Even if Ms. Buchhorn did not personally become aware of the information in the report until later, it certainly was reasonably available to her prior to the criminal trial. *See State v. Bodine*, 313 Kan. 378, 402-03 (2021) (documents filed under seal do not prevent the parties or the court from accessing them).

Second, with respect to the contention that Dr. Mitchell withheld impeachment evidence, Ms. Buchhorn's trial counsel knew of the underlying New York controversy before trial, and her posttrial counsel questioned Ms. Buchhorn's trial counsel about the *Rivas* decision during posttrial proceedings in February 2019. Thus, Ms. Buchhorn knew or had reason to know of the alleged withholding of this impeachment information years before her conviction was invalidated.

Finally, Plaintiffs' remaining *Brady* theories concern Dr. Mitchell's alleged failure to perform additional forensic testing and his testimony that O.O.'s heart was normal. The scope of Dr. Mitchell's examinations, the specimens collected, and the testing performed were documented in the autopsy report and known or reasonably discoverable during the criminal proceedings. Moreover, Ms. Buchhorn's posttrial proceedings involved extensive examination of Dr. Mitchell's investigative methods and the adequacy of his forensic conclusions. Likewise, Dr. Mitchell's testimony regarding O.O.'s heart was necessarily known to Ms. Buchhorn when it was given. Thus, the conduct underlying these theories was known or reasonably discoverable before Ms. Buchhorn's conviction was invalidated on August 19, 2022. Because Plaintiffs did not file this action until December 16, 2024, both theories are barred by the two-year statute of limitations.

**2. Malicious prosecution**

Plaintiffs allege Dr. Mitchell maliciously caused Ms. Buchhorn's continued confinement and prosecution by fabricating a false cause of death, suppressing exculpatory evidence, and

providing false testimony. (ECF 178). The undisputed evidence establishes that Plaintiffs cannot prevail on this claim. Even if Plaintiffs could establish a genuine dispute of material fact concerning a constitutional violation, Dr. Mitchell would still be entitled to summary judgment based on qualified immunity because his purported conduct did not violate clearly established law. Finally, this claim is barred by the statute of limitations.

To prevail on a § 1983 malicious prosecution claim, Ms. Buchhorn must establish that (1) Dr. Mitchell caused her continued confinement or prosecution; (2) the criminal proceedings terminated in her favor; (3) probable cause did not support her arrest, continued confinement, or prosecution; (4) Dr. Mitchell acted with malice; and (5) she sustained damages. *Shrum v. Cooke*, 60 F.4th 1304, 1310 (10th Cir. 2023). For purposes of this motion, Dr. Mitchell does not dispute that the criminal proceedings terminated in Ms. Buchhorn's favor or that she sustained damages from her confinement. Plaintiffs cannot establish a genuine dispute of material fact supporting the remaining elements.

**a. Dr. Mitchell did not fabricate evidence**

Plaintiffs contend that Dr. Mitchell manufactured a nonexistent cause of death and that law enforcement and prosecutors relied on that fabricated evidence to charge and prosecute Ms. Buchhorn. (ECF 178). The record does not support these contentions. Dr. Mitchell conducted an autopsy of O.O. and documented numerous physical findings, including an occipital skull fracture, scalp hemorrhages, and injuries to the torso and abdominal organs. In reaching his final conclusions concerning the cause and manner of death, Dr. Mitchell considered both his own anatomical findings and the supplemental cardiac pathology, laboratory, and toxicology reports he obtained. After evaluating those findings, Dr. Mitchell concluded that O.O. died from blunt force trauma and classified the manner of death as homicide. His autopsy report documented his findings

as well as the supplemental findings Plaintiffs now contend support an alternative cause of death. Plaintiffs' expert, Dr. Turner, disputes Dr. Mitchell's interpretation of the evidence, including whether the injuries caused O.O.'s death and when they occurred. But even assuming Dr. Mitchell's conclusions were incorrect or based on a scientifically invalid methodology, that does not establish that he fabricated evidence. *See Kennedy v. Peele*, 552 F. App'x 787, 792-94 (10th Cir. 2014) (distinguishing the fabrication of forensic test results from conclusions drawn using an unreliable methodology); *see also Moses-EL v. City & County of Denver*, No. 20-1102, 2022 WL 1741944, at *11, n.17 (10th Cir. May 31, 2022) (defendant entitled to qualified immunity when there are competing interpretations of forensic test results, even when the defendant's interpretation was wrong).

Plaintiffs also challenge Dr. Mitchell's findings concerning O.O.'s heart. During the autopsy, Dr. Mitchell personally examined O.O.'s heart after he removed it and did not identify a patent foramen ovale. He documented that finding in the autopsy report. Dr. Mackey-Bojack subsequently examined the heart and identified a PFO. Plaintiffs may contend that Dr. Mitchell's findings were incorrect in light of Dr. Mackey-Bojack's subsequent examination. However, the fact that another pathologist identified an anatomical finding that Dr. Mitchell did not observe does not establish that Dr. Mitchell knowingly or recklessly falsified his examination findings. Significantly, Dr. Mitchell considered and incorporated Mackey-Bojack's report into his autopsy report, thereby documenting both his own findings and her findings. Although Dr. Mitchell ultimately concluded that Dr. Mackey-Bojack's findings did not alter his determination that O.O. died from blunt force trauma, he did not destroy or conceal that evidence. Instead, he preserved both sets of findings in the same report.

Ultimately, Plaintiffs' allegations concern the accuracy of Dr. Mitchell's examination findings and his interpretation of the evidence. Even if some of Dr. Mitchell's observations or conclusions were incorrect, Plaintiffs must establish more than negligence or disagreement among medical professionals to impose liability for fabrication of evidence. *See Moses-EL*, No. 20-1102, 2022 WL 1741944, at *11, n.17. The record contains no evidence from which a reasonable jury could conclude that Dr. Mitchell knowingly or recklessly falsified his findings or cause-of-death determination to induce Ms. Buchhorn's prosecution.

**b. Dr. Mitchell did not suppress exculpatory evidence**

Plaintiffs also contend that Dr. Mitchell caused Ms. Buchhorn's prosecution and continued confinement by suppressing exculpatory evidence. As discussed in Section V.B.I concerning Plaintiffs' *Brady* claim, which is incorporated herein by reference, the factual record does not establish that Dr. Mitchell withheld or suppressed exculpatory evidence. Rather, Dr. Mitchell incorporated Dr. Mackey-Bojack's cardiac pathology findings and the laboratory results into his autopsy report, filed that report with the district court in accordance with Kansas law, and separately provided those documents, along with the entirety of his file, to the prosecution long before Ms. Buchhorn's criminal trial. Ms. Buchhorn's defense counsel knew of the historical allegations concerning Dr. Mitchell's prior employment in New York, and his alleged failure to conduct additional testing did not constitute unconstitutional suppression of evidence. Nor is there evidence that Dr. Mitchell concealed material forensic findings from prosecutors, prevented them from independently evaluating the evidence, or otherwise manipulated the evidentiary record to induce Ms. Buchhorn's prosecution. Accordingly, the undisputed evidence establishes that Dr. Mitchell did not cause Ms. Buchhorn's prosecution or continued confinement through the suppression of exculpatory evidence.

**c. Dr. Mitchell did not cause Ms. Buchhorn's prosecution or continued confinement**

The Tenth Circuit recognizes that the independent decisions of prosecutors and courts ordinarily interrupt the causal chain between an investigator's conduct and a subsequent prosecution. *Taylor v. Meacham*, 82 F.3d 1556, 1563-64 (10th Cir. 1996); *see also Barham v. Town of Greybull Wyo.*, 483 F. App'x 506, 509 (10th Cir. 2012) (plaintiff failed to allege "any pressure or influence or made any knowing misstatements to the prosecutor, and thus the chain of causation was broken by the prosecutor's decision to file charges as well as by the state court's decision to bind Plaintiff over at the preliminary hearing."). In *Taylor*, the Tenth Circuit explained that the chain of causation is broken by an indictment absent evidence that the investigating officers exerted improper pressure or influence or knowingly made false statements to prosecutors. 82 F.3d at 1564. The court further held that an adversarial preliminary hearing independently breaks the causal chain where the judge hears testimony, evaluates credibility, reviews the evidence, and determines that probable cause exists to bind the accused over for trial. *Id.* at 1563-64.

Here, Dr. Mitchell's role was limited to conducting the autopsy and providing his forensic findings. He did not identify Ms. Buchhorn as the person responsible for O.O.'s injuries, prepare the arrest-warrant affidavit, seek the warrant, file criminal charges, or decide whether the prosecution should continue. Those decisions were made by law enforcement, prosecutors, and the state court. Moreover, Dr. Mitchell also did not conceal the information underlying his conclusions from prosecutors. His autopsy report documented the injuries he observed and incorporated the alleged exculpatory findings. Those materials were provided to the prosecutors. The prosecution therefore possessed all of the information necessary to evaluate Dr. Mitchell's conclusions. They

were the same materials used by Plaintiffs' expert Dr. Turner in formulating her opinions and criticism of Dr. Mitchell.

Ms. Buchhorn's prosecution was also subjected to independent judicial review. Following her arrest, the Douglas County District Court conducted a preliminary hearing at which the State was required to present evidence establishing probable cause to believe Ms. Buchhorn committed the charged offense. Ms. Buchhorn had an opportunity to challenge the State's evidence, including Dr. Mitchell's conclusions. After considering the evidence presented, the court determined that probable cause existed and bound Ms. Buchhorn over for trial. At trial, Dr. Mitchell's findings and opinions were again subject to challenge through cross-examination and expert evidence.

Plaintiffs cannot avoid the effect of these independent decisions merely by disputing Dr. Mitchell's medical conclusions. Although the causal chain may remain intact where an official knowingly fabricates evidence, conceals material information, or improperly influences the prosecutor or court, *Pierce*, 359 F.3d 1279, Plaintiffs cannot establish a genuine dispute of material fact regarding whether Dr. Mitchell engaged in such misconduct here. In *Pierce*, the chemist allegedly concealed exculpatory test results and affirmatively misrepresented her findings to induce prosecution, thereby preventing prosecutors and the court from making an informed decision. Here, in complete contrast, Dr. Mitchell documented the physical findings supporting his conclusions, included the cardiac and laboratory reports in his completed autopsy report, and provided those materials to the prosecution. Dr. Mitchell did not deprive prosecutors of the information necessary to independently evaluate his opinions. Dr. Mitchell therefore did not cause Ms. Buchhorn's prosecution or continued confinement within the meaning of § 1983.

**d. The undisputed evidence establishes that Ms. Buchhorn's prosecution was supported by probable cause**

To establish malicious prosecution, Plaintiffs must demonstrate that Ms. Buchhorn's prosecution was unsupported by probable cause. *See Shrum*, 60 F.4th at 1310. "Probable cause does not require proof beyond a reasonable doubt or even a preponderance of the evidence." *Hopper v. Fenton*, 665 F. App.'x 685, 686 (10th Cir. 2016). "Instead, the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." *Id.* For Plaintiffs to succeed, they must show there was not even arguable probable cause to prosecute Ms. Buchhorn. *See Moses-EL*, No. 20-1102, 2022 WL 1741944, at *14. To do so, they "must put forth controlling precedent from the Supreme Court or our circuit that squarely governs the case here and puts the constitutional issue beyond debate." *Id.* (internal citations and quotes omitted).

Here, the Douglas County District Court conducted a preliminary hearing and determined that probable cause existed to believe Ms. Buchhorn committed the charged crime. That determination followed the presentation of evidence and an opportunity for Ms. Buchhorn to challenge the State's case, including Dr. Mitchell's forensic conclusions. As discussed above, Plaintiffs have not established that Dr. Mitchell knowingly or recklessly fabricated evidence or concealed material information. Thus, no basis exists to disregard the court's probable cause determination.

**e. Dr. Mitchell did not act with malice.**

To establish malicious prosecution, Plaintiffs must demonstrate that Dr. Mitchell acted with malice, not merely that his conclusions were erroneous or negligent. Malice requires evidence of intent. *Chavez-Torres v. City of Greeley*, 660 Fed. Appx. 627, 629 (10th Cir. 2016). The record contains no evidence that Dr. Mitchell knew Plaintiffs, had any animosity toward them, intended to implicate Ms. Buchhorn in a crime she did not commit, or knowingly or recklessly

misrepresented his forensic findings to secure Ms. Buchhorn's prosecution. As district coroner, Dr. Mitchell was responsible for investigating O.O.'s death and documenting his findings concerning the cause and manner of death. *See* K.S.A. § 22a-232(a). Dr. Mitchell never identified Ms. Buchhorn as the person responsible for O.O.'s death.

Moreover, Dr. Mitchell's conduct is inconsistent with Plaintiffs' contention that he deliberately manufactured evidence to support a criminal prosecution. As discussed above, Dr. Mitchell documented his anatomical findings, incorporated the supplemental cardiac pathology and laboratory reports into his autopsy report, and provided his file to the prosecution. He also acknowledged limitations in his findings, including that certain injuries could have resulted from resuscitation efforts and that he could not definitively determine when those injuries occurred. Rather than concealing evidence inconsistent with his conclusions, Dr. Mitchell preserved and disclosed the very findings Plaintiffs now rely upon to challenge his cause-of-death determination.

The Tenth Circuit's decision in *Moses-EL*, No. 20-1102, 2022 WL 1741944, at *14 is instructive. There, the plaintiff brought a § 1983 malicious prosecution claim against a forensic serologist who interpreted test results as inconclusive. The plaintiff's experts subsequently concluded that those same results should have excluded him as a suspect. The Tenth Circuit rejected the argument that the serologist had knowingly or recklessly misrepresented the evidence, holding that the disagreement between the forensic experts did not establish malice. Distinguishing *Pierce*, 359 F.3d 1279, the court explained that an allegedly erroneous interpretation of forensic evidence, without proof that the examiner knowingly or recklessly misrepresented the evidence, does not establish the requisite state of mind for malicious prosecution.

The same distinction applies here. Plaintiffs challenge Dr. Mitchell's interpretation of the findings and foundation for his cause-of-death opinion, but even assuming that his conclusions

were incorrect or scientifically unsupported, Plaintiffs must establish more to demonstrate malice. The record contains no evidence from which a reasonable jury could conclude that Dr. Mitchell deliberately falsified his conclusions or acted with reckless disregard for their accuracy. Accordingly, the undisputed evidence establishes that Dr. Mitchell did not act with malice, and he is entitled to summary judgment on Plaintiffs' malicious prosecution claim.

#### f. Plaintiffs cannot establish procedural-due-process malicious prosecution

To the extent Count IV asserts malicious prosecution under the Fourteenth Amendment's procedural-due-process clause, Kansas provides an adequate remedy through its common law malicious prosecution action. *Lindenman v. Umschied*, 255 Kan. 610, 624 (1994). That remedy forecloses a procedural due process malicious prosecution theory based on the conduct alleged here. *See Myers v. Koopman*, 738 F.3d 1190, 1193-94 (10th Cir. 2013); *Morphew v. Chaffee County*, 172 F.4th 802, 814, n.15 (10th Cir. 2026).

#### g. The malicious prosecution claim is time-barred

Kansas's two-year statute of limitations applies to claims arising under § 1983. K.S.A. § 60-513(a)(4). A malicious prosecution claim accrues when the underlying criminal prosecution terminates in the plaintiff's favor. *Thompson v. Clark*, 596 U.S. 36, 44-45 (2022). In *Thompson*, the Supreme Court clarified that favorable termination requires only that the "particular prosecution" ended without a conviction, not an affirmative indication of innocence. *Id.* at 45, 49. In determining when a constitutional claim arising from a criminal prosecution accrues, the Tenth Circuit has recognized that the invalidation of a conviction may trigger accrual despite the possibility of subsequent criminal proceedings. *Smith v. Gonzales*, 222 F.3d 1220, 1222-23 (10th Cir. 2000). In *Smith*, the Tenth Circuit held that a § 1983 claim accrued upon the invalidation of

the plaintiff's conviction, despite the possibility of retrial, because the constitutional violations underlying the original conviction could not recur in subsequent proceedings. 222 F.3d at 122-23.

Here, the prosecution allegedly caused by Dr. Mitchell culminated in Ms. Buchhorn's conviction in July 2018. On August 19, 2022, the Kansas Supreme Court affirmed the reversal of the conviction. Although the criminal charges remained pending, the State abandoned Dr. Mitchell on October 5, 2022, and by November 1, 2022, the district court had entered an order requiring the State to disclose its new expert and expert's report by December 16, 2022. Thus, by November 1, 2022, at the latest, the prosecution based on Dr. Mitchell ended. Any subsequent prosecution would proceed on an evidentiary basis independent of Dr. Mitchell, and Dr. Mitchell neither participated in nor influenced the decisions concerning further prosecution.

Treating the formal dismissal of charges as the accrual date under these circumstances would undermine the purpose of the statute of limitations. Statutes of limitations prevent the litigation of stale claims and protect defendants from having to defend against allegations after evidence has deteriorated and memories have faded. *See Board of Regents v. Tomanio*, 446 U.S. 478, 486-87 (1980). By using the date when the charges were formally dismissed as the accrual date, the limitations period applicable to Dr. Mitchell could remain suspended for years, or even decades, after prosecutors abandoned his opinions, merely because the State continued pursuing charges on a different evidentiary basis. For example, if prosecutors obtained new evidence supporting probable cause and secured another conviction, which was subsequently overturned years later, Dr. Mitchell's alleged misconduct from the original prosecution would remain actionable despite the fact that he played no role in the subsequent proceedings. The mere continuation of the same criminal case should not indefinitely postpone accrual of a claim against an individual whose allegedly unconstitutional conduct no longer plays a role in the prosecution.

Accordingly, Dr. Mitchell contends that the malicious prosecution claim accrued when Ms. Buchhorn's conviction was invalidated on August 19, 2022, or, alternatively, no later than November 1, 2022, when the prosecution involving Dr. Mitchell as a witness terminated.

**3. Conspiracy**

Plaintiffs allege that Dr. Mitchell conspired with Douglas County and nonparties Valdez and Seiden to deprive them of their First and Fourteenth Amendment rights by (1) maliciously causing Ms. Buchhorn's prosecution; (2) withholding exculpatory evidence; (3) pursuing an appeal and retrial following reversal of Ms. Buchhorn's conviction; and (4) continuing to publicly declare Ms. Buchhorn guilty after the criminal charges were dismissed. The undisputed evidence establishes that Dr. Mitchell did not enter into an agreement to accomplish any of these objectives and that his conduct did not result in a constitutional deprivation.

To establish a conspiracy under § 1983, Plaintiffs must demonstrate an agreement and concerted action among the alleged conspirators to deprive them of a constitutional right, as well as an actual deprivation of that right. *Douglass v. Garden City Community College*, 543 F. Supp. 3d 1043, 1060 (D. Kan. 2021). The alleged conspirators must have shared a specific objective to violate Plaintiffs' constitutional rights through a particular course of conduct. *Bledsoe v. Jefferson County*, 275 F. Supp. 3d 1240, 1252 (D. Kan. 2017). Although an agreement may be established through circumstantial evidence, Plaintiffs must present evidence from which a reasonable jury could infer a meeting of the minds to accomplish an unlawful objective. Mere cooperation among governmental officials in the performance of their respective duties does not establish a constitutional conspiracy.

First, the undisputed evidence establishes that Plaintiffs did not suffer an underlying constitutional violation attributable to the alleged conspiracy. The first two alleged objectives

(maliciously causing Ms. Buchhorn's prosecution and suppressing exculpatory evidence) are the same alleged constitutional violations underlying Counts III and IV. For the reasons previously discussed, and which are incorporated herein by reference, Plaintiffs cannot establish a genuine dispute of material fact concerning the alleged constitutional violations underlying their *Brady* and malicious prosecution claims.

Plaintiffs' reliance on the First and Fourteenth Amendments supplies additional grounds for rejecting Plaintiffs' theories. Plaintiffs cannot establish First Amendment retaliatory prosecution, which requires protected activity and a prosecution substantially motivated by that activity. *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007). The pretrial order identifies no retaliatory-prosecution theory,[2] and even if it did, the record contains no evidence that Dr. Mitchell procured Ms. Buchhorn's prosecution in response to protected First Amendment activity. Likewise, alleged suppression does not independently establish a First Amendment violation. *Brady* protects the due process right to a fair trial. *Brady*, 373 U.S. at 87. Plaintiffs fail to show a constitutional deprivation of their First Amendment rights under this conspiracy theory.

Second, there is no evidence that Dr. Mitchell agreed with Douglas County or anyone else to violate Ms. Buchhorn's constitutional rights. Dr. Mitchell's involvement arose from his duties as district coroner. He conducted the autopsy, documented his findings, and provided his forensic conclusions to the prosecution. Although Plaintiffs disagree with those conclusions, the record does not establish that Dr. Mitchell reached them pursuant to an agreement with Douglas County to implicate Ms. Buchhorn in a crime she did not commit. Indeed, Dr. Mitchell's conduct is inconsistent with such an agreement. Rather than concealing findings that Plaintiffs now characterize as exculpatory, he incorporated Dr. Mackey-Bojack's cardiac pathology report and

[2] Plaintiffs assert a claim for malicious prosecution under the First Amendment, but no such cause of action exists.

laboratory results into his completed autopsy report and provided those materials to prosecutors. Nor is there evidence that Douglas County directed Dr. Mitchell's forensic conclusions, instructed him to withhold evidence, or otherwise participated in the alleged misconduct. The fact that Dr. Mitchell and other governmental officials performed their respective functions in connection with the criminal investigation does not establish a conspiracy. *See Allen v. Linn Cnty. Bd. of Comm'rs*, No. 2:23-cv-02453-HLT-BGS, 2024 WL 3066168, at *12-13 (D. Kan. June 20, 2024). The record contains no evidence of an agreement to accomplish an unconstitutional objective.

Third, Plaintiffs cannot establish a genuine dispute of material fact regarding whether Dr. Mitchell participated in an agreement to pursue an appeal or retrial following reversal of Ms. Buchhorn's conviction. Decisions concerning whether to appeal, retry Ms. Buchhorn, or dismiss the criminal charges rested with the prosecution, not Dr. Mitchell or Douglas County. *See State v. Sherman*, 305 Kan. 88, 92, 378 P.3d 1060 (2016) ("The power of the State to charge and prosecute its citizens for criminal violations of the law . . . is vested exclusively in a prosecutor who is given vast discretion to make both charging decisions and the myriad of practical and strategic decisions that occur in the course of a prosecution.") There is no evidence that Dr. Mitchell directed, encouraged, or participated in those decisions. Moreover, on October 5, 2022, prosecutors announced that they would no longer rely on Dr. Mitchell's cause-of-death opinions. The record does not establish that Dr. Mitchell attempted to influence the prosecutor's subsequent decisions or participated in an agreement to continue prosecuting Ms. Buchhorn. The mere fact that prosecutors pursued the prosecution following reversal does not establish that Dr. Mitchell conspired with them to violate Ms. Buchhorn's constitutional right.

Finally, Plaintiffs cannot establish a genuine dispute of material fact regarding whether Dr. Mitchell participated in an agreement to publicly declare Ms. Buchhorn guilty after the criminal

charges were dismissed. The record contains no evidence that Dr. Mitchell publicly declared Ms. Buchhorn guilty following dismissal or agreed with anyone else to make such statements. Nor can Plaintiffs establish that statements allegedly made by others after Ms. Buchhorn's release and dismissal of the charges caused the constitutional deprivation underlying their claims. In particular, statements made after Ms. Buchhorn's release could not have caused her prior confinement or the resulting interference with her familial relationships. Moreover, "[d]efamation, slander, and libel are not federal constitutional violations." *Garrison v. Dedeke*, No. 21-3188-SAC, 2022 WL 1125558, at *4 (D. Kan. Apr. 15, 2022) (citing *Siegert v. Gilley*, 500 U.S. 226, 233 (1991) (citing *Paul v. Davis*, 424 U.S. 693, 708-09 (1976))). Accordingly, this allegation provides no independent basis for imposing liability for conspiracy.

Plaintiffs' conspiracy claim is also barred by the statute of limitations. For the reasons discussed in the previous sections, which Dr. Mitchell incorporates herein by reference, Plaintiffs' conspiracy claim accrued when Ms. Buchhorn's conviction was invalidated on August 19, 2022, or, alternatively, no later than November 1, 2022, when the prosecution abandoned Dr. Mitchell's opinions and proceeded on an independent evidentiary basis. *See Smith v. Gonzales*, 222 F.3d 1220, 1222-23 (10th Cir. 2000). With specific respect to the claim that Plaintiffs' rights were violated by Douglas County, Defendant Mitchell, Ms. Valdez, and Mr. Seiden pursuing an appeal and retrial post reversal of Ms. Buchhorn's criminal conviction, this is not a separate claim from the claim that the Defendants maliciously caused her prosecution. *See Robinson v. Maruffi*, 895 F.2d 649, 654 (10th Cir. 1990) (considering appeals, reversal of conviction, and retrial part of a malicious prosecution claim because the plaintiff remained subject to false charges). Consequently, this conspiracy theory is barred by the statute of limitations for the same reasons

her malicious prosecution claim is barred by the statute of limitations. Accordingly, summary judgment is appropriate.

Finally, any claim for conspiracy to deprive Plaintiffs of familial relationships fails. First, this claim is not included in the Pretrial Order, so it's waived. Regardless, a familial-association claim requires conduct directed at a protected relationship with knowledge that the conduct will adversely affect it. *Thomas v. Kaven*, 765 F.3d 1183, 1195-96 (10th Cir. 2014). Family separation resulting from wrongful conviction and imprisonment does not alone establish the required intent. *Lowery v. County of Riley*, 522 F.3d 1086, 1092-93 (10th Cir. 2008). The Court applied that requirement when dismissing Count VII against Dr. Mitchell. (ECF 87, pp. 11-12). Plaintiffs identify no evidence that Dr. Mitchell joined an agreement directed at interfering with their familial relationships. Accordingly, they cannot establish the underlying deprivation required to sustain this conspiracy theory.

For these reasons, the undisputed evidence establishes that Dr. Mitchell did not enter into an agreement to violate Plaintiffs' constitutional rights or cause an underlying constitutional deprivation through the alleged conspiracy. Alternatively, Dr. Mitchell is entitled to qualified immunity because Plaintiffs cannot establish that his conduct violated clearly established law. Dr. Mitchell is therefore entitled to summary judgment on Plaintiffs' conspiracy claim.

## VI. Conclusion

For the reasons discussed above, the undisputed material facts establish that Dr. Mitchell is entitled to judgment as a matter of law on Plaintiffs' three remaining claims against him for *Brady* violations, malicious prosecution, and conspiracy.

WHEREFORE, Defendant Erik Mitchell respectfully requests that the Court grant his motion for summary judgment and grant such other relief that he may show he is entitled to and the Court deems to be reasonable, appropriate, and just.

Respectfully submitted,

**Kurtz & Buck LLC**

/s/ Cory R. Buck
Cory R. Buck, KS 25969
Jamie L. Welch, KS 29318
Makaylah L. Jones, KS 30418
1201 NW Briarcliff Pkwy, 2nd Floor
Kansas City, MO 64116
Tel: (816) 897-7500
Fax: (816) 897-7500
cory.buck@kurtzbuck.com
jamie.welch@kurtzbuck.com
makaylah.jones@kurtzbuck.com
Attorneys for Defendant Mitchell

**Certificate of Original Signature and Service**

I hereby certify that on October 23, 2026, a true and correct copy of the above and foregoing was served by electronic filing with the Clerk of the Court in the CM/ECF system, which will automatically send email notification of such filing to all counsel of record.

/s/ Cory R. Buck
Cory R. Buck